UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

                                    Case No. 24-cr-198-pp

   v.

LAKIA JACKSON,

        Defendant.

---

**ORDER OVERRULING DEFENDANT'S OBJECTIONS (DKT. NO. 33), ADOPTING JUDGE JOSEPH'S REPORT AND RECOMMENDATION (DKT. NO. 28) AND DENYING DEFENDANT'S MOTION TO DISMISS (DKT. NO. 19)**

---

On October 16, 2024, the grand jury returned a twenty-count indictment charging the defendant with offenses relating to a scheme to defraud Wisconsin Medicaid through the defendant's company, "We Care Services" (a PreNatal Care Coordination and Childcare Coordination company in Milwaukee). Dkt. No. 1. On March 10, 2025, the defendant moved to dismiss Counts Thirteen and Fourteen (charging aggravated identity theft under 18 U.S.C. §1028A(a)(1)). Dkt. No. 19. The defendant argued that the Supreme Court's decision in Dubin v. United States, 599 U.S. 110 (2023), "radically altered the use and application" of the aggravated identity theft statute and rendered the pending charges untenable. Id. at 4. On May 6, 2025, Magistrate Judge Nancy Jospeh issued a report recommending that this court deny the defendant's motion.

1

Dkt. No. 28. The defendant timely filed an objection, dkt. no. 33, and the government responded, dkt. no. 35.

In United States v. Barnes, Case No. 23-cr-113-pp, 2024 WL 3409856, at *11 (E.D. Wis. July 15, 2024), this court rejected an almost identical argument in a case with similar facts. Based on the same reasoning, the court will overrule the defendant's objections to Judge Joseph's recommendation, adopt that recommendation and deny the motion to dismiss.

## I. Legal Standard

In a criminal case, district judges may designate magistrate judges to submit to the district court judge proposed findings of fact and recommendations for disposition of a "dispositive" motion, such as a motion to dismiss an indictment. 28 U.S.C. §636(b)(1)(B). When a magistrate judge submits to the district judge proposed findings and recommendations under §636(b)(1)(B), the parties have fourteen days to object to the magistrate judge's report and recommendation. 28 U.S.C. §636(b)(1)(C). If a party objects, the district judge must make a *de novo* determination of the portions of the report and recommendation to which the party objects. 28 U.S.C. §636(b)(1)(C). The district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge;" the district judge also has the options of asking for further evidence or to sending the issue back to the magistrate judge with instructions for further proceedings. Id.

## II.     Facts

In her recommendation, Judge Joseph provided the following brief recitation of the relevant facts:

> At all times relevant, [the defendant] owned and operated We Care Services ("WCS"), a Prenatal Care Coordination ("PNCC") and Childcare Coordination ("CCC") company in Milwaukee, Wisconsin. (Indict., Docket #1.) The government alleges that [the defendant] unlawfully bribed women to enroll in the CCC and PNCC benefit programs by offering free baby supplies and cash. (*Id.* ¶ 3.) The government further alleges that [the defendant] then incentivized her employees to inflate their billings to Wisconsin Medicaid by tying their compensation to the amount WCS billed. [The defendant] further instructed her employees to falsify the duration, frequency, date, and nature of the services rendered. (*Id.*) The government asserts Wisconsin Medicaid has paid [the defendant] over $3,000,000 to which she was not entitled.

> Relevant to this motion, Counts Thirteen and Fourteen allege as follows:

> ### Count Thirteen (Aggravated Identity Theft)

> 6. On or about June 30, 2021, in the State and Eastern District of Wisconsin, [the defendant] knowingly possessed and used, without lawful authority, a means of identification of another person, specifically the name, date of birth, and Wisconsin Medicaid ID number of D.M., during and in relation to the felony offense of health care fraud, in violation of 18 U.S.C. § 1347, as charged in Count One of this Indictment, knowing that the means of identification belonged to another actual person and that D.M. had not enrolled as a client of [the defendant's] program and had not received any covered services between June 30, 2020, and June 7, 2021. In violation of Title 18, United States Code, Section 1028A(a)(1).

> ### Count Fourteen (Aggravated Identity Theft)

> 7. On or about April 26, 2021, in the State and Eastern District of Wisconsin, [the defendant] knowingly possessed and used, without lawful authority, a means of identification of another person, specifically the name, date of birth, and Wisconsin Medicaid ID number of D.M., during

3

and in relation to the felony offense of health care fraud, in violation of 18 U.S.C. § 1347, as charged in Count Two of this Indictment, knowing that the means of identification belonged to another actual person, and that D.M. had not enrolled as Jackson's client and had not received any covered services between September 1, 2020, and April 8, 2021. In violation of Title 18, United States Code, Section 1028A(a)(1).

Dkt. No. 28 at 2.

## III. Defendant's Motion to Dismiss

A. <u>Defendant's Brief in Support of the Motion</u> (Dkt. No. 20).

In her March 10, 2025 brief to Judge Joseph in support of the motion to dismiss, the defendant asserted that the indictment contains no allegations "that [the defendant] posed as D.M. when submitted the allegedly fraudulent bills to Wisconsin Medicaid" and that it does not allege that the defendant "stole D.M.'s identity." Dkt. No. 20 at 4. She argued that "the record is completely devoid of any evidence that [the defendant] ever stole or misappropriated D.M.'s identity," and said that "it can reasonably be presumed that D.M. voluntarily provided [the defendant] with her information prior to receiving services from WCS." <u>Id.</u> Based on those arguments, the defendant contended that the court should dismiss Counts Thirteen and Fourteen following the U.S. Supreme Court's 2023 decision in <u>Dubin</u>, 599 U.S. at 110. <u>Id.</u>

The defendant asserted that <u>Dubin</u> involved facts "nearly identical" with the facts alleged in the instant indictment; she went on to describe those facts. <u>Id.</u> The defendant characterized the government's argument in <u>Dubin</u> as an argument that §1028A(a)(1) (the aggravated identity theft statute) automatically

4

applies "any time a name or other means of identification happened to be part of the payment or billing method used in the commission of a long list of predicate offenses, including Medicaid fraud." Id. at 5. She asserted that Dubin had argued that "the use of a means of identification must have 'a genuine nexus' to the predicate offense," and that when the predicate offenses is fraud, "the manner in which the identification is used should not merely be an ancillary feature of the payment or billing method." Id. According to the defendant, the Supreme Court rejected the government's argument and determined that the analysis of a §1028A aggravated identity fraud violation requires consideration of "who is involved" rather than "when" or "how" the identification information was used. Id. at 6 (citing Dubin, 599 U.S. at 131).

In support of her argument, the defendant cited a 2024 decision from the Northern District of Georgia, in which the court distinguished between identifying information and ancillary information such as that contained in business records. Id. at 6-7 (citing United States v. Noble, 713 F. Supp. 3d 1366 (N.D. Ga. 2024)). She also cited a 2024 Ninth Circuit decision in which the court reversed an aggravated identity theft conviction in a Medicaid fraud case because the patient's name—the "who"—was ancillary to the billing method. Id. at 8 (citing United States v. Ovesepian, 113 F.4th 1193 (9th Cir. 2024)). Finally, she cited a 2023 decision from the Eastern District of Virginia in which the court had allowed a defendant to withdraw her plea to aggravated identity theft in a COVID-related unemployment insurance benefits scheme in

5

the wake of Dubin. Id. at 8 (citing United States v. Crockett, Case No. 3:22cr32-01, 2023 WL 8654379 (E.D. Va. Dec. 14, 2023)).[1] Id.

The defendant went on to parse the Dubin decision, id. at 8-11, and to provide her own interpretation of that ruling, id. at 11-12. She reiterated that Counts Thirteen and Fourteen do not allege that the defendant mispresented "who" was the recipient of the alleged fraudulent services and do not otherwise assert that the defendant stole the identifiers from D.M. or forged D.M.'s signature. Id. at 11. The defendant maintained that §1028A(a)'s mandatory, two-year minimum, consecutive sentence is a severe enhancement for offenses that do not otherwise impose mandatory incarceration and for someone with no criminal background. Id. at 11, 15. She classified the use of patients' names as a mere "technicality" for the submission of Medicaid reimbursements. Id. at 12. She contended that the indictment does not allege that she forged a signature, stole documents, posed as a client or took any action that was more than incidental. Id. at 13. The defendant asked the court to dismiss the two aggravated identity theft counts because "at the very least, the indictment should state all the elements of the charged offense and put the defendant on notice as to the nature of the charge so they can prepare a defense." Id. at 14.

---

[1] The defendant's brief did not provide the court with a cite for the Crockett decision. Nor did the defendant provide the court with the subsequent history in which the district court first determined that the defendant's arguments regarding Dubin provided a credible defense, but that the jury would make the final decision, United States v. Crockett, Case No. 22cr32-01, 2024 WL 100196 (E.D. Va. Jan. 8, 2024) and then vacated its December 2023 ruling, United Crockett, 2024 WL 129014 (E.D. Va. Jan. 10, 2024).

6

B.    Government's Response (Dkt. No. 21)

The government filed its opposition brief on March 20, 2025. Dkt. No. 21.

The government began by detailing its factual allegations:

> [The] charges [in the indictment] arise from, and relate to, [the defendant's] ownership and operation of We Care Services ("WCS"), which was a Prenatal Care Coordination ("PNCC") and Childcare Coordination ("CCC") company in Milwaukee, Wisconsin. Both PNCC and CCC work is, under the correct circumstances, billable to Wisconsin Medicaid. PNCC companies, like the one [the defendant] founded and operated, are supposed to help pregnant women who are at high risk for poor birth outcomes by identifying and providing necessary referrals and connections to mitigate their risks. The CCC benefit is an extension of the PNCC benefit, and similarly provides payment for providers to coordinate referrals to service providers meant to improve family functioning.
>
> As set out in the Indictment, beginning by at least June 2020, and continuing through December 2021, [the defendant] executed a scheme to defraud Wisconsin Medicaid. The scheme involved, among other things, billing to Wisconsin Medicaid for PNCC and CCC services that We Care Services had not provided. [The defendant] also offered "free" items, such as car seats, pack 'n' plays, and diapers to induce women to enroll for, and stay enrolled for, her company's "services." [The defendant] then billed for these "services," even though WCS almost never provided them. Then, [the defendant] falsified her billings to Wisconsin Medicaid, representing that she or her employees had provided services that were never provided. And, most relevant to the aggravated identity theft charges the defendant seeks to have dismissed, [the defendant] sought and received from Wisconsin Medicaid payment for services that she purported were rendered (but were not rendered) to clients on dates that preceded the date on which the client first met a representative of WCS or enrolled with the company. In other words, as described more fully below, [the defendant's] company signed up clients and then "back billed" Medicaid for months of completely fabricated services that she claimed were provided before anyone from her company had ever interacted with, or enrolled, the client.

Id. at 2-3.

In describing the aggravated identity theft charges in Counts Thirteen and Fourteen, the government explained that these charges alleged that the

defendant had misused patients' identifying information to create a fraudulent bill to Medicaid by taking the identifying information she'd obtained from those patients *after* the patients had enrolled as a client at WCS and using that information to create a fraudulent bill to Medicaid for fabricated services allegedly rendered *before* those patients were enrolled as a WCS client—services that had not been provided. Id. at 3-4.

The government then observed that this court already had rejected the argument that Dubin foreclosed a charge of aggravated identity theft where the government has alleged that the defendant used a victim's identifiers—without lawful authority—to bill Medicaid for services never rendered to the victim on dates that precede by months the date on which the defendant or her company first met the victim. Id. at 1, 5 (citing Barnes, 2024 WL 3409856, at *11). The government argued that §1028A applies whenever the "means of identification" is "integral to what makes the conduct fraudulent." Id. at 5 (quoting Dubin, 599 U.S. at 117-18). The government maintained that "[b]ased on the facts of *Dubin* itself and related cases, using another person's identity to bill for fictitious services that person never received fits squarely within Section 1028A." Id. The government distinguished the facts of Dubin from the facts in this case because the defendant in Dubin provided services to the actual patient but billed Medicaid as if a licensed psychologist had completed the tests (rather than the licensed psychological associate who had done so). Id. at 5-6. The government explained that the Fifth, Sixth and Eleventh Circuits had confirmed that Dubin "did not disturb the conclusion that a defendant

8

commits aggravated identity theft, in connection with health care fraud, when she lies about providing services to an individual whose identity she uses to bill for fictitious services." Id. at 6-7 (citing United States v. Croft, 87 F. 4th 644, 647 (5th Cir. 2023); United States v. O'Lear, 90 F.4th 519, 533 (6th Cir. 2024); United States v. Gladden, 78 F.4th 1232, 1245 (11th Cir. 2023)).

The government maintained that Counts Thirteen and Fourteen of the indictment properly charged the defendant because the allegations make clear that the defendant submitted bills for services that never were provided, but that purported to have been provided months before the person whose identifying information appeared on the bills ever interacted with the defendant or her company. Id. at 7. The government argued that, unlike the defendant in Dubin, the defendant in this case lied about who received services. Id. at 8. The government pointed out that this court already had explained why such allegations fall squarely under §1028A:

> The defendant's use of J.J.'s and A.E.'s means of identification is at the crux of the defendant's alleged healthcare fraud because she effectively represented to Medicaid that the clients authorized her to seek payment for services rendered on a specific date, when they had not received services on that date and, thus, had not authorized her to receive a related payment. Dubin—and caselaw from other circuits—confirms that such allegations are sufficient to state a claim for aggravated identity theft. [United States v. ]Michael, 882 F.3d [624,] at 629 [(6th Cir. 2018)] (explaining that a defendant's use of client's "identifying information to fashion a fraudulent submission out of whole cloth, mak[es] the misuse of these means of identification 'during and in relation to'—indeed integral to—the predicate act of healthcare fraud").

Id. at 10 (quoting Barnes, 2024 WL 3409856, at *11). The government distinguished the cases that defendant had cited in her brief, primarily on the

9

grounds that the defendant in this case is alleged to have used another person's identity to submit a fraudulent bill, making the "who" the crux of the fraud. Id. at 12-15.

The government disputed that Dubin requires actual theft of identification information because, as this court held in Barnes, a defendant does not act with lawful authority if the defendant uses another person's identity on a date when no services were provided. Id. at 17. The government also argued that district courts cannot "dismiss charges based on the judge's assessment of the fairness of the penalty prescribed by Congress." Id. at 18. It reminded the court that whether to charge, and what to charge, are within the discretion of the executive branch—the prosecution—not the judicial branch. Id. The government asserted that "if the government can marshal proof to meet the required elements, dismissal of an indictment is not permissible, even if the Court disagrees with the government's exercise of [prosecutorial] discretion." Id.

C.    Defendant's Reply (Dkt. No. 25)

The defendant responded that the government's opposition brief unfairly relied on facts from the underlying investigation rather than the facts alleged within the four corners of the indictment. Dkt. No. 25 at 1. The defendant argued that there is an important distinction between never providing services at any point and billing for services on a specific date. Id. at 2. She said, "[s]hould they [presumably the patients] have received services at other points in time, the alleged conduct, billing for some dates on which services were

10

never provided among other dates on which services were provided is exactly the conduct that the *Dubin* Court determined should not give rise to Aggravated Identity Theft . . . charges: 'over-billing [that] was facilitated by the patient's Medicaid reimbursement number.'" Id. (citing Dubin, 599 U.S. at 128).

The defendant recounted that she has been charged with billing for services that were not provided on a specific date. Id. She argued that "[w]ithout proper context, that one date would be part of a larger series of submission to Wisconsin Medicaid that purportedly bill clients for some dates on which services were never provided and for dates in which services were provided," and that for that reason, the allegations could not form the basis for aggravated identity theft charges. Id. The defendant said that the allegations in the indictment included bribing women to provide their Medicaid numbers, using identifiers to bill Medicaid for the maximum number of hours allowed, submitting bills for services even though the defendant had provided no services for the dates listed and providing patients with no services at all; she argued that the indictment fails to state which of those acts give rise to Counts Thirteen and Fourteen, and says she "believes" that the evidence will show that both of the patients referred to in Counts Thirteen and Fourteen eventually became clients (although the defendant does not state whether she "believes" that the evidence will show that the two patients received any services). Id. at 3. The defendant again cited the Ninth Circuit's decision in Ovsepian, 113 F.4th 1193 (9th Cir. 2024), insisting that its facts were similar to the facts alleged in this case and that it underscored the holding in Dubin that

11

identification must be at the crux of what makes the predicate offense criminal. Id. at 3-4. (The defendant conceded in a footnote that the Ovespian court did not hold that the patient's name was ancillary to the billing method employed. Id. at 4 n.1.) The defendant reiterated her argument that there is nothing in the indictment to suggest that she misappropriated or stole identities. Id. at 4-5. And she asserted that "[t]he mandatory period of incarceration justifies heightened scrutiny of the government's use of a § 1028A indictment" and "demands a fact-drive assessment be conducted when examining a challenge to the use of § 2018 A." Id. at 5.

## IV.    Report and Recommendation (Dkt. No. 28)

Judge Joseph recommended that this court reject the defendant's arguments. Dkt. No. 28. She began by applying Federal Rule of Criminal Procedure 7(c)(1), which requires that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Id. at 3. She recounted that an indictment meets these requirements if it states the elements of the offense, informs the defendant of the nature of the charges so that she can prepare a defense and enables the defendant to plead acquittal or conviction as a bar to future prosecutions for the same offense. Id. (citations omitted). Judge Joseph explained that when an indictment identifies the elements, it need only provide enough facts to allow the defendant to identify the conduct on which the government bases its case. Id. She emphasized that when confronting a pre-trial motion to dismiss an

indictment, a court must review the indictment on its face, without regard to the strength or weakness of the government's case. Id.

Judge Joseph next turned to the Dubin decision. She briefly recounted the facts of Dubin—that his company had submitted a claim to Medicaid that represented that the employee who had provided the billed-for services was a licensed psychologist (when, in fact, that employee was only a licensed psychological associate). Id. at 4. She also recounted the Dubin holding: that the "use" of another person's identification must be "at the crux of what makes the conduct criminal" and that the means of identification "specifically must be used in a manner that is fraudulent or deceptive." Id. (quoting Dubin, 599 U.S. at 131, 132). She recounted the defendant's argument—that she is alleged with having used her clients' identifying information to fraudulently overbill Medicaid, not to steal their identities, commit theft or pose as the clients. Id. at 4-5. And Judge Joseph recounted the defendant's argument that she'd eventually provided services to the two patients identified in Counts Thirteen and Fourteen. Id. at 5.

Judge Joseph then acknowledged the government's citation of Barnes. Id. at 5 (citing United States v. Barnes, Case No. 23-cr-113, 2024 WL 3694475 (E.D. Wis. May 14, 2024)). The case Judge Joseph cited, however, is the report and recommendation by Magistrate Judge Stephen C. Dries, recommending that this court deny defendant Barnes's motion to dismiss the aggravated identity theft counts against her. In the citation, Judge Joseph acknowledged that Judge Dries's recommendation had been "adopted." Id. But she did not

discuss or analyze the district court's ruling (the undersigned's ruling) adopting Judge Dries's recommendation, Barnes, 2024 WL 3409856 (E.D. Wis. July 15, 2024)—which is the ruling upon which the government relied. (See Dkt. No. 21 at 5.)

Judge Joseph stated that she was reaching the same conclusion in her recommendation that Judge Dries had reached in his recommendation in Barnes. Dkt. No. 28 at 6. She stated, "Unlike in Dubin, [the defendant in this case] did not merely misrepresent the manner in which an examination was performed to inflate the bill." Id. She found that the indictment "alleges that [the defendant] used her clients' identifying information, without their authorization, to represent to Medicaid that she provided services that were never rendered, on dates when [the individuals] were not clients." Id. Judge Joseph concluded that "the means of identification was central to facilitating the fraud and deceiving Wisconsin Medicaid into paying improper claims." Id. (citing United States v. Gladden, 78 F.4th 1232, 1246 (11th Cir. 2023); United States v. Michael, 882 F.3d 624, 628 (6th Cir. 2018)). She found that the defendant's "conduct therefore fits squarely within § 1028A," Id. conduct "centered on a misrepresentation of an employee's qualifications for services actually provided to a patient." Id. "In other words, the deception did not go to 'who' received the services, but to 'how' and 'when' the service was performed." Id. at 4.

Judge Joseph also acknowledged the defendant's argument that even if she billed Medicaid for services not provided on the dates represented, if she

14

ultimately did provide those services on different dates, Counts Thirteen and Fourteen would constituted only typical overbilling charges, not aggravated identity theft (given the reasoning in <u>Dubin</u>). <u>Id.</u> Judge Joseph rejected this argument, explaining that "Counts Thirteen and Fourteen are tailored to specific timeframes when *no* services were rendered, and when those patients were not clients," and pointed out that the <u>Dubin</u> Court "understood overbilling as 'inflating the value of services actually provided[.]'" <u>Id.</u> (quoting <u>Dubin</u>, 599 U.S. at 114). She emphasized that the indictment in this case charges the defendant with billing for services she had not provided, without the clients' authorization. <u>Id.</u>

Judge Joseph distinguished the Northern District of Georgia case, <u>Noble</u>, upon which the defendant relied; the defendant in <u>Noble</u> had pled guilty to aggravated identity theft for his involvement in a COVID-19 small business loan scheme. <u>Id.</u> at 7. Judge Joseph explained that the scheme in <u>Noble</u> was perpetrated by inflating revenues, the amount of goods sold and the number of employees, not the use of someone else's identity. <u>Id.</u> She contrasted those facts with the allegations in this case, which she said "hinged on [the patients'] identifying information and enrollment in Wisconsin Medicaid," emphasizing that without the patients' personal information, the defendant could not have been reimbursed by Medicaid. <u>Id.</u> Judge Joseph concluded that the patients' identities "were material to perpetuating the scheme." <u>Id.</u> Finally, Judge Joseph found that the indictment "clearly alleges that [the defendant] used the [named patients'] names, dates of birth, and Wisconsin Medicaid identification

15

numbers to claim that she provided services during a specific timeframe when she allegedly did not," thus giving the defendant adequate notice of the charges against which she must defend. Id. at 8.

## V. Objections

### A. Defendant's Objections (Dkt. No. 33)

The defendant's objections to Judge Joseph's recommendations were due fourteen days after the May 6, 2025 ruling—that is, by May 20, 2025. The defendant timely sought an extension of time, which the court granted. Dkt. No. 32. The defendant filed her objections by the extended deadline, so they are timely.

At the beginning of her objections, the defendant states that she requests "a de novo review." Dkt. No. 33 at 1. She then characterizes Judge Joseph as having based her decision on "four grounds." Id. She says that Judge Joseph (1) concluded that the defendant's use of her client's identifying information to bill for services that weren't provided "went to the 'crux' of the alleged fraud and not merely to misrepresent how a service was performed so as to inflate a bill," (2) distinguished Dubin in finding that the defendant billed for services not provided while Dubin inflated the value of services actually provided, (3) concluded that the defendant's conduct is distinguishable from the defendant's conduct in the Noble decision because the information Noble misrepresented "did not go to the 'who' of the individual whose identity was used" and (4) found that the indictment sufficiently sets forth how the defendant's use of identifying information constituted the crux of the underlying fraud scheme. Id. at 1-2.

16

The body of the objection appears to raise at least two other issues. At page 5, the defendant asserts (as she did in her reply brief to Judge Joseph) that in its brief in opposition to the motion to dismiss (Dkt. No. 21), the government improperly asked Judge Joseph to consider facts outside the four corners of the indictment, and she argues that "[t]hese additional assertions should not be considered in determining the facial validity of the indictment." Id. at 5. And at page 15 of the objections, the defendant argues (as she did to Judge Joseph) that because aggravated identity theft carries an implicitly harsh mandatory minimum sentence, "the government must not be permitted to add a charge based on healthcare identifying information which is present in virtually all cases wherein healthcare fraud is alleged." Id. at 15-16.

B.     Government's Response (Dkt. No. 35)

The government explains that although the defendant's objection characterizes Judge Joseph as having based her recommendation on four findings, the defendant "does not specify—at least not explicitly—which of these findings, or which partes of them, she challenges." Dkt. No. 35 at 4 n.2 The government says that it has tried to "identify from the body of [the defendant's] brief the specific points of the magistrate's analysis to which [the defendant] objects (some of which are not enumerated in her list of four 'findings') and responds herein only to those points." Id.

The government first argues that Counts Thirteen and Fourteen sufficiently allege aggravated identity theft, by alleging that the defendant used the named individuals' identifying information "to submit fraudulent bills

claiming that services were provided [on certain dates] when in fact no services were provided whatsoever on those dates and those people had not yet even enrolled as clients with [the defendant's] company." Id. at 7. The government says that these allegations "satisfy the elements of Section 1028A, which provides that a defendant commits aggravated identity theft when she 'knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person' during and in relation to certain enumerated offenses (including healthcare fraud)." Id. at 7-8. The government maintains that Judge Joseph's conclusion that that regard was correct, as was her conclusion that the defendant's use of the identifying information was at the crux of what made the offense fraudulent. Id. at 8.

Next, the government argues that contrary to what the defendant has argued, the facts of this case are different from those in Dubin. Id. at 9. The government references both Judge Dries's decision and this court's decision in Barnes when arguing that this case does not involve "garden-variety overbilling," but a defendant who "fabricated, out of whole cloth, bills to Medicaid claiming reimbursement for services never provided to anyone." Id. The government quotes the undersigned's ruling in Barnes (albeit from the docket, rather than the Westlaw decision), in which the undersigned wrote that the defendant in Barnes

> could not have convinced the government to reimburse her for services she didn't provide without misrepresenting to the government that on the dates she listed, she'd provided those services to someone. Medicaid would not have paid the claim if she'd simply said that she provided services on [a particular date], without identifying the clients to whom she allegedly provided the services.

18

> She had to give names and identifying information to commit the fraud, but she used the names and identifying information of people who had not received services from her on those dates.

Id. at 9-10 (quoting Barnes, Case No. 23-cr-113, Dkt. No. 33 at 29; 2024 WL 3409856, at *11 (E.D. Wis. July 15, 2024)). The government says that the same is true in this case, in particular because "the benefits under which [the defendant] submitted her fraudulent claims only permit companies to bill for . . . high-risk mothers with young children and pregnant women" and thus that the identifying information of the individuals' information "was not ancillary—it was the operative information [the defendant] needed to get paid." Id. at 10. The government asserts that the defendant in this case couldn't have used just anyone's identifying information—she needed *Medicaid* information for qualifying individuals. Id. And, the government says, this conclusion would not change even if the indictment had alleged that at some point, the defendant had obtained the named individuals' permission to use their identities to bill Medicaid for services she provided them on other dates (which it does not). Id. at 10-11.

Next, the government challenges the defendant's reliance on the Noble decision from the Northern District of Georgia. Id. at 11. The government recounts that Noble involved COVID-19 small business loans the defendant had obtained by filing fraudulent applications using other people's names and then misrepresenting facts about their real or purported businesses. Id. at 11-12. The government echoes Judge Joseph's finding that Noble's fraud did not depend on the identity of the person whose name was on the application, but

19

on the information about that person's business. Id.at 12. The government reiterates that here, the defendant's fraud depended on the persons listed on the bills being Medicaid recipients eligible to receive the billed-for benefits. Id. at 12-13.

The government next responds to the defendant's arguments (made to Judge Joseph, but which Judge Joseph did not directly address in her recommendation) that §1028A requires proof of actual theft or misappropriation. Id. at 13. The government says that the statute does not require proof of how the defendant obtained the identifying information but rather the use of the identifying information without lawful authority. Id. The government points to three district courts that have rejected the same argument made by the defendant. Id. (citing United States v. Iannelli, Case No. 22-10069, 2023 WL 7165109, at *2-3 (D. Mass. Oct. 31, 2023); United States v. Felch, Case No. 21-CR-0570, 2024 WL 406554 at *2-5 (D.N.M. Jan. 22, 2024); United States v. Jones, Case No. 23CR09, 2023 WL 4672383, at *5 (E.D. Va. July 20, 2023)). The government again cites Barnes for the proposition that a provider who submits a claim to Medicaid for services to a particular client on a particular date necessarily uses that client's identifying information without lawful authority when no services were provided (even if the provider had permission to use the identifying information on some other date). Id. at 14-15.

Finally, the government argues that the defendant's insistence that the court should consider the penalty for the charged offenses in deciding a motion

to dismiss is improper, is not supported by any authority and would require the court to usurp executive branch discretion. Id. at 15-16. Although it maintains that the seriousness of the offense is not an appropriate factor when a court is considering a motion to dismiss the indictment, the government says that it is worth highlighting that the defendant "stands accused of stealing more than $3 million from the government in just a year and a half." Id. at 17. The government refers to defendant's conduct as "brazen and egregious," and argues that her efforts to minimize her conduct are incongruous with the facts at issue in this case Id.

## VI.    Analysis

This district court's analysis of the defendant's objections is complicated by the fact that the defendant appears to have cut and pasted from her brief in support of the motion to dismiss most of the content of her objections to Judge Joseph's report and recommendation. That means that, with minor exceptions, the objections are not tailored to Judge Joseph's findings. Although the defendant asked for "de novo review," she did not explain which of the factual findings she described on the first and second pages of her objections warranted *de novo* review (or which parts of those findings warranted such review). And because Judge Joseph's recommendation did not mention some of the arguments the defendant made in her brief in support of the motion to dismiss, those arguments—as repeated in the objections—relate to findings that Judge Joseph did not make.

21

Although the defendant did not simply make a blanket objection to all of Judge Joseph's findings and conclusions and incorporate by reference all her prior arguments, her choice to copy and paste much of her prior brief and present it as objections causes some of the same problems caused by the "blanket objection" approach. A party must make "specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2).

> There are reasons for the specificity requirement. Specificity "provides a district court judge with notice as to which issues are being contested and therefore adequately deals with the sandbagging problem." Johnson v. Zema Systems Corp., 170 F.3d 734, 742 (7th Cir. 1999).
>
>> Such precision guides the district court in making [her] de novo review, directing the judge to precisely those lines of reasoning the party finds objectionable. Specifying the basis of a litigant's objections will also likely improve a litigant's chances of convincing a district court judge that the magistrate judge's analysis was in error.
>
> Id.

United States v. Shelton, Case No. 22-cr-162-pp, 2023 WL 49281315, at *19-20 (E.D. Wis. Aug. 2, 2023). The defendant has not specified to which of Judge Joseph's findings she objects or tailored her arguments to those objections. The court has done its best to address what it perceives to be the defendant's objections.

Also complicating—or perhaps simplifying, depending on one's point of view—this district court's analysis is the defendant's perplexing failure to mention, or acknowledge, the fact that the undersigned previously has considered—and rejected—the defendant's interpretation of the impact of Dubin in a case with almost identical facts. Although the government's brief in

22

opposition to the motion to dismiss mentioned this court's July 2024 decision in United States v. Barnes, and Judge Joseph's report and recommendation mentioned Magistrate Judge Dries's report and recommendation in that same case, the defendant's pleadings do not mention the case or acknowledge either the government's or Judge Joseph's discussion of it. The court issued the Barnes ruling over seven months before the defendant filed her motion to dismiss; the Barnes ruling—from the same district in which she is being prosecuted, by the same judge presiding over her case—was as available to her as the cases she has cited from other district courts in other circuits. Her failure to mention or acknowledge an arguably controlling ruling is perplexing.

At any rate, after asking for a *de novo* review, the defendant first identifies Judge Joseph's finding that "[the defendant's] use of her clients' identifying information to bill for services which were never provided went to the 'crux' of the alleged fraud and not merely to misrepresent how a service was performed to as to inflate a bill." Dkt. No. 33 at 1. It is not clear which of the arguments in the defendant's thirteen or so pages of argument are meant to challenge this finding. But Judge Joseph came to this conclusion after a discussion of Dubin in which she distinguished the facts of that case from the facts of this one. Dkt. No. 28 at 4-6. So this court will presume that the defendant disagrees with Judge Joseph's reasoning distinguishing the facts of the two cases. That makes it an opportune time to for the court to discuss its prior ruling in Barnes.

In Barnes, the indictment alleged

23

that the defendant "owned and operated Here For You Prenatal Care Coordination Services LLC ('HFY')," "a Prenatal Care Coordination ('PNCC') and Childcare Coordination ('CCC') company, which billed Wisconsin Medicaid ('Medicid') for services purported provided to pregnant women and mothers in Milwaukee, Wisconsin." [ ]

It assert[ed] that the defendant orchestrated a scheme to defraud Medicaid in which she "advertised on Facebook, and in the community, for pregnant and new mothers to enroll in HFY's PNCC and CCC program." . . . She "often induced women to enroll by offering free baby supplies such as diapers, wipes, and strollers." . . . After women enrolled, the defendant "instructed her employees to falsify billing submissions to Wisconsin Medicaid that knowingly misstated the duration, frequency, date and nature of the services provided." . . . The defendant "and other individuals she directed and controlled, submitted claims for payment to Medicaid based on false and fraudulent billing statements." . . . The indictment alleges that as part of her scheme, the defendant "submitted and caused to be submitted bills totaling over $2.5 million, which contained false and fraudulent statements, and which caused Wisconsin Medicaid to pay her over $2.3 million to which she was not entitled." . . .

Barnes, 2024 WL 3409856, at *3 (E.D. Wis. July 15, 2024). Counts Eleven and Twelve of the indictment against Barnes charged aggravated identity theft in the same language the indictment in this case charges the defendant. Id.

Barnes argued that "because Counts Eleven and Twelve allege that she billed Medicaid for services not provided to clients on specific dates, but do not foreclose the possibility that she provided covered services to the clients on other dates, those counts allege only that she engaged in overbilling." Id. at 9. She asserted that "under Dubin, allegations of overbilling do not suffice to support a charge of aggravated identity theft." Id. This court agreed with the proposition that Dubin had held that overbilling does not constitute aggravated identity theft, but rejected Barnes's broader argument:

The defendant reads into the indictment allegations it does not contain. Nowhere does the indictment allege that the defendant *ever*

24

billed Medicaid for covered services actually provided to J.J. or A.E. Alleging that the defendant billed Medicaid for services she did not provide on a specific date does not equate to an allegation—or even imply—that the defendant billed Medicaid for services that *were* provided on a different date. Granted, the indictment does not allege that the defendant *never* billed Medicaid for services provided to J.J. or A.E. But the fact that the indictment does not allege that the defendant never billed Medicaid for services actually provided does not prove, or imply, that she did bill Medicaid for services actually provided.

Even if the indictment alleged that the defendant had sometimes billed Medicaid for dates on which services were provided to J.J. and A.E. and other times had billed for dates on which services were not provided to them, it is not clear that such allegations would constitute the type of "overbilling" that "the *Dubin* court determined should not give rise to aggravated identity theft charges." Dkt. No. 30 at 3. The Dubin court explained that overbilling occurs when someone "fraudulently inflate[s] the price of a service or good they actually provided." Dubin, 599 U.S. at 114. In Dubin, the defendant's patients received the services for which the defendant had billed Medicaid. Id. The defendant lied about the qualifications of the employee who provided the services so that he could inflate the amount he billed Medicaid, billing the employee as a licensed psychologist when he was a licensed psychological associate. Id.

The defendant's argument boils down to a claim that if a defendant bills Medicaid for providing services to Tom Smith on twenty occasions, when the defendant provided services to Tom Smith on only ten occasions, that defendant simply has overbilled for the services the defendant provided to Tom Smith—not stolen Tom Smith's identity.

As far as it goes, the defendant is correct that such a situation would result in "overbilling." But the argument ignores the specific allegations in Counts Eleven and Twelve. Count Eleven alleges that on or about January 26, 2021—a specific date on which the indictment alleges that the defendant provided no services to J.J.— the defendant used "without lawful authority" J.J.'s name, date of birth and Wisconsin Medicaid I.D. number to commit health care fraud. Dkt. No. 1 at 7. Count Twelve alleges that on or about March 22, 2023—a specific date on which the indictment alleges that the defendant provided no services to A.E.—the defendant knowingly used "without lawful authority" A.E.'s name, date of birth and Wisconsin Medicaid I.D. number to commit health care fraud. Id. at 8. Even if the defendant had permission to use J.J.'s identity to bill

Medicaid for services she provided on some date other than January 26, 2021 (and again, the indictment does not allege that she did), Count Eleven specifically alleges that she did not have such permission, or authority, on January 26, 2021. She could not have billed—or, as the defendant attempts to characterize it, "overbilled"—Medicaid at all if she had not used J.J.'s identifying information without J.J.'s authorization. The same is true for the billing alleged in Count Twelve. Both counts allege that the defendant used the identity of another person to commit health care fraud (billing for services not rendered).

Barnes, 2024 WL 3409856, *9.

Just as Judge Joseph found, the same is true here. Counts Thirteen and Fourteen allege that that the defendant in this case knowingly used someone's identification during and in relation to an identified healthcare fraud offense, knowing that that identification "belonged to another actual person" and that that actual person "had not enrolled as a client of [the defendant's] program and had not received any covered services" on specified dates. Even if, at some point, the defendant had permission to use the identifying information of the individuals identified in Counts Thirteen and Fourteen on some other dates, the indictment alleges that she did not have that permission on the dates listed in the indictment. She could not have convinced Medicaid to pay her had she not used identifying information from a person qualified to receive the services she claimed (allegedly falsely) to have provided those individuals on those dates. That means—as Judge Joseph found—that the defendant's use of the identifying information (including Medicaid numbers) of qualifying individuals to convince Medicaid to pay her for services her company did not render to those individuals on the dates stated in Counts Thirteen and Fourteen was the "crux" of the fraudulent activity. This is not simply a case in which the

26

defendant billed Medicaid for more than what the services she'd actually provided were worth (the facts of Dubin). In order for the defendant's alleged scheme to succeed, she *had* to use the identifying information of qualified individuals, and to misrepresent that she'd provided those individuals services her company had not provided on dates she did not provide them.

The same is true for the defendant's challenge to Judge Joseph's conclusion that what the defendant allegedly did was significantly different from what Dubin did. The defendant says that Judge Joseph found that she "billed for Medicaid services not provided while Dubin's error was inflating the value of services actually provided," dkt. no. 33 at 1, implying that that difference is not legally significant under Dubin. The defendant's argument ignores the fact that Dubin could have lawfully billed Medicaid for the services provided to the people he identified in his billings if he'd truthfully described the qualifications of the person who provided those services. The defendant, however, not only did not provide the services for which she billed, but she *could not* lawfully have billed for those services unless she could provide Medicaid with the identifying information of someone who was qualified to receive them. That is the fact that significantly and legally distinguishes what this defendant is alleged to have done from what Dubin did, and Judge Joseph was correct in reaching that conclusion.

Next, the defendant challenges Judge Joseph's conclusion that the facts in this case are distinguishable from the facts in the Noble case. The defendant's argument ignores the fact that there is a controlling case in her

27

own district—this court's decision in Barnes—and insists that Judge Joseph, and apparently this court, should instead rely on a non-binding district court decision[2] from the Northern District of Georgia. Even if a judge in this district had decided Noble, it would not be persuasive because the facts of Noble were different, as the court's ruling demonstrates:

> Where Noble admitted he used another's means of identification— O.O.'s name, perhaps also her address and various identification numbers—his use of the means of identification was not material to the small-business-loan fraud. Whether the loan application was successful hinged not on O.O.'s identifying information but on her business records. And where Noble acted fraudulently and deceptively—by filing loan applications using "false gross revenues, costs of goods sold, number of employees"—his actions did not involve identity because business records are not a means of identification specific to O.O. The information that Noble misrepresented went not to "who" O.O. was, but to the "what" and the "how": what her business consisted of and how her business qualified for a loan.

Noble, 713 F. Supp. 3d at 1372. In contrast, the information that the defendant here allegedly misrepresented goes directly to "who" the individuals named on the bills were—people enrolled in Medicaid with valid Medicaid numbers who were eligible for the services the defendant falsely claimed her company provided.

The defendant challenges Judge Joseph's conclusion that the indictment adequately sets forth how her use of the individuals' identifying information constituted the crux of the underlying fraud scheme. Dkt. No. 33 at 2. This court rejected the same argument in Barnes:

---

[2] A single district court decision is not binding on other district judges in the same district. United States v. Articles of Drug Consisting of 203 Paper Bags, 818 F.2d 569, 572 (7th Cir. 1987).

28

In Dubin, the defendant's use of the client's means of identification to bill Medicaid was *ancillary* to the fraud—not the *crux* of the fraud—because the client received the services described in the billing, from the provider identified in the billing. In other words, because the client had received the services described, the client effectively had authorized the defendant to use his name to claim payment for those services. See Dubin, 599 U.S. at 132. "The crux of [Dubin's] healthcare fraud was a misrepresentation [to Medicaid] about the qualifications of [Dubin's] employee" to inflate his billing to Medicaid. Id. "The patient's name," on the other hand,' was an ancillary feature of the billing method employed." Id.

Here, the defendant is alleged to have used J.J.'s and A.E.'s means of identification to represent to Medicaid that those clients had received services on specific dates when, in fact, the clients had not received services on the dates indicated (and possibly not at all). . . . . The defendant's use of J.J.'s and A.E.'s means of identification is at the crux of the defendant's alleged healthcare fraud because she effectively represented to Medicate that the clients authorized her to seek payment for services rendered on a specific date, when they had not received services on that date and, thus, had not authorized her to receive a related payment. Dubin—and caselaw from other circuits—confirms that such allegations are sufficient to state a claim for aggravated identity theft. Michael, 882 F.3d at 629 (explaining that a defendant's use of client's "identifying information to fashion a fraudulent submission out of whole cloth, mak[es] the misuse of these means of identification 'during and in relation to'— indeed integral to—the predicate act of healthcare fraud").

Barnes, 2024 WL 3409856, at *10-*11. The allegations in Counts Thirteen and Fourteen state the elements of an identity fraud offense, fairly inform the defendant of the nature of what the government alleges that she did and enable her to address double jeopardy concerns in the event of future prosecutions for the same offense.

The court has observed that because the defendant copied and pasted most of her objections from her brief in support of her motion to dismiss, there are other arguments in the objections that the defendant may have intended to be challenges to Judge Joseph's ruling. The objection argues that the

29

government's alleged "additional assertions" of facts not contained in the indictment "should not be considered in determining the facial validity of the indictment." Dkt. No. 33 at 5. In her reply brief in support of the motion to dismiss, she argued that

> [i]f facts outside of the four corners of the indictment could be considered in assessing its sufficiency, both the quantity and quality of services rendered would be relevant to counter the government's assertion. The distinction between never providing services at any point and billing for services provided on a specific date is an important one. Should they have received services at other points in time, the alleged conduct, billing for some dates on which services were never provided among other dates on which services were provided is exactly the conduct that the *Dubin* Court determined should not give rise to Aggravated Identity Theft . . .charges: "over-billing [that] was facilitated by the patient's Medicaid reimbursement number." *Dubin v. United States*, 599 U.S. 110, 128 (2023).

Dkt. No. 25 at 1-2.

To the extent that the defendant meant for this to be an objection to Judge Joseph's recommendation, it's not clear why. The court cannot discern that Judge Joseph relied on any facts outside the four corners of the indictment to reach her conclusions, and although the defendant has accused the *government* of relying on such facts, it has not identified anywhere in Judge Joseph's recommendation where *she* relied on any such facts. And to the extent that the facts the defendant says the court should not consider are the government's assertions that she did not provide any services to the individuals named in the billings (see Dkt. No. 33 at 5), the court has recounted that the defendant concedes that she is not arguing that she eventually rendered services to those individuals on other dates. Dkt. No. 33 at 16. At any rate, this

court is not relying on facts outside the four corners of the indictment; the allegations in the indictment are sufficient to support the court's conclusions.

The defendant argues that the indictment fails to assert that she stole the individuals' identifying information or forged their signatures. Id. at 12. But she cites no authority (other than her own reasoning) finding that Dubin requires such conduct to state a claim for aggravated identity theft. The government, on the other hand, cites at least three other courts that have concluded that Dubin does not require such conduct—Iannelli, 2023 WL 7165109, at *2-3; Felch, 2024 WL 406554 at *2-5; Jones, 2023 WL 4672383, at *5.

Finally, the defendant says that Judge Joseph did not address "the draconian result of an [aggravated identity theft] charge." Dkt. No. 33 at 17. Thought she admits that this court "does not have discretion with respect to sentencing" for such a charge, she emphasizes that in Dubin, Justice Sotomayor "spent significant time explaining how a seemingly innocuous course of conduct could result in mandatory incarceration," saying that she was "emphasizing that heightened scrutiny must be employed when a court is called upon to interpret the application of [aggravated identity theft] to a given fact situation." Id.

The government is correct that charging decisions—whether to charge, whom to charge and with what offenses—is an executive branch function, not a judicial branch function. The defendant asserts, however, that because Justice Sotomayor discussed the aggravated identity theft penalty when articulating

31

the Court's decision in Dubin, she meant to impose a "heightened scrutiny" test on district judges reviewing motions to dismiss such charges. That is not what the Dubin opinion says. The defendant omits much of Justice Sotomayor's reasoning on this point. Here is what Justice Sotomayor said in its entirety:

> Section 1028A's list of predicate offenses points to yet another stumbling block for the Government's broad reading. Section 1028A(a)(1) is an enhancement, and a severe one at that. It adds a 2-year mandatory prison sentence onto underlying offenses that do not impose a mandatory prison sentence of any kind. See, *e.g.*, 18 U.S.C. § 1035 ("[f]alse statements relating to health care matters," setting no minimum sentence). This prevents sentencing judges from considering the severity of the offense, even if the amount of money involved was quite small or there are other mitigating factors. Interpretation of § 1028A(a)(1) should thus reflect the "distinction between" the aggravated identity theft crimes that "Congress sought to distinguish for heightened punishment and other crimes." *Leocal* [*v. Ashcroft*], 543 U.S. [1,] at 11 [(2004)].

> Far from distinguishing, the Government's reading collapses the enhancement into the enhanced. Here, the Government claims that because petitioner's overbilling was facilitated by the patient's Medicaid reimbursement number, § 1028A(a)(1) automatically applies. Patient names or other identifiers will, of course, be involved in the great majority of healthcare billing, whether Medicare for massages . . . or for ambulance stretcher services . . . . Patient names will be on prescriptions . . . and patients committing fraud on their own behalf will often have to include the names of others on their forms, such as doctors or employers. Under the Government's own reading, such cases are "automatically identity theft," . . . independent of whether the name itself had anything to do with the fraudulent aspect of the offense.

> Nor are these implications confined to healthcare. Section 1028A(a)(1)'s predicates include a vast array of offenses, including wire fraud and mail fraud. § 1028A(c)(5). The Government's boundless reading of "uses" and "in relation to" would cover facilitating mail fraud by using another person's name to address a letter to them. Even beyond that, names or other means of identification are used routinely for billing and payment, whether payment apps, credit and debit cards, a bill sent by mail, or an

32

invoice sent electronically. So long as the criterial for the broad predicate offenses are met, the Government's reading creates an automatic 2-year sentence for generic overbilling that happens to use ubiquitous payment methods.

A far more sensible conclusion from the statutory structure is that § 1028A(a)(1)'s enhancement is not indiscriminate, but targets situations where the means of identification itself plays a key role—one that warrants a 2-year mandatory minimum. This points once more to a targeted reading, where the means of identification is at the crux of the underlying criminality, not an ancillary feature of billing.

Dubin, 599 U.S. at 127-129 (some citations omitted).

Justice Sotomayor did *not* state, and the Dubin Court did not hold, that district courts must apply "heightened scrutiny" to challenges to aggravated identity theft charges because they carry mandatory minimum penalties. Justice Sotomayor said that reading the statutory language as broadly as the government urged would "collapse the enhancement into the enhanced," obliterating the distinction between that conduct warranting the enhancement and that conduct not warranting the enhancement. In a sense, she was referencing the "anti-surplusage" canon of statutory construction, "under which courts read statutory text with an eye toward avoiding rendering any language superfluous." United States v. Turner, 47 F.4th 509, 517 (7th Cir. 2022).

And Justice Sotomayor's concern that the government's proposed reading of the statute would "sweep in the hour-inflating lawyer, the steak-switching waiter, the building contractor who tacks an extra $10 onto the price of the paint he purchased" was expressed in the context of explaining that the Court avoids "reading incongruous breadth into opaque language in criminal

33

statutes." Id. at 130. All the language the defendant quotes has to do with principles of statutory construction, not with creating new, "heightened" standards of review for motions to dismiss charges that carry particular penalties. The defendant reads Dubin far, far too broadly.

This court has reviewed the defendant's arguments *de novo*—including some that Judge Joseph did not address in her ruling. The court will deny the defendant's motion to dismiss. It will, by separate order, schedule a status conference at which the parties should be prepared to advise the court how they plan to proceed.

## VII. Conclusion

The court **OVERRULES** the defendant's objections. Dkt. No. 33.

The court **ADOPTS** Judge Joseph's recommendation. Dkt. No. 28.

The court **DENIES** the defendant's motion to dismiss Counts Thirteen and Fourteen. Dkt. No. 19.

Dated in Milwaukee, Wisconsin this 5th day of August, 2025.

BY THE COURT:

HON. PAMELA PEPPER
Chief United States District Judge

34