**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA**,

          Plaintiff,                    **Case No.** 24-CR-198

v.

**LAKIA JACKSON,**

          Defendant.

---

### SENTENCING MEMORANDUM

---

The following is provided to the Court to assist in formulating a disposition, which is "sufficient, but not greater than necessary" to effectuate the objectives of sentencing. *United States v. Booker*, 543 U.S. 220 (2005).

The impact of a criminal sentence can sometimes be more consequential to others than to the defendant, herself. The case of *United States of America v. Lakia Jackson* is one such example. The unusual circumstances of Lakia's family create a panoply of problems. They are dire and have potentially devastating effects. Two of Lakia's six children have been diagnosed with Autism Spectrum Disorder (ASD): "AMH" (D.O.B. 04/03/2015) and "YT" (D.O.B. 12/21/2021). A third child lives with ADHD and Bipolar Disorder: "AH" (age 13 years old).

### I.  <u>LAKIA'S SPECIAL NEEDS CHILDREN</u>

Autism Spectrum Disorder has a range of possible symptoms, behaviors, and signs. Stereotypical behaviors vary depending on the degree of autism, but the hallmark of the disorder is compromised communication and interaction skills with others. The attached article, "What Are the Symptoms of Autism?", published by the Eunice Kennedy Shriver National Institute of Child

Health and Human Development, provides an overview of the disorder. See Exhibit 1. Although the effects of autism are highly variable, parents and caregivers must concern themselves with a multitude of behavioral irregularities. They include, but are not limited to complete non-verbalization; intense and/or violent tantrums; hyper-activity; resistance to direction; and inability to communicate needs and/or desires.

Although AMH and YT fall at different points on the autism spectrum, they both present significant behavioral, developmental, social, and control considerations. Psychological evaluations for the two children to determine SSI eligibility have been conducted by Dr. Betty Eitel. They are submitted under separate cover. See Exhibits 2 and 3. Each of the children now receive Social Security benefits for their respective impairments.

### a) AMH'S AUTISM

Dr. Eitel concluded that AMH, who is now ten years old, suffers from Autism Spectrum Disorder, Level 1, with accompanying language impairment. See Exhibit 2 at page 7. At Level 1 Autism, the individual requires support, without which deficits in social communication causes noticeable impairments. The person has difficulty initiating social interactions; has atypical or unsuccessful responses to social overtures by others; may appear to have decreased interest in social interactions; has inflexibility of behavior, which causes significant interference in functioning; has difficulty in switching between activities; has problems in organization and planning, which hamper independence. See Exhibit 4 at page 2, "Autism Speaks: ASD Levels of Severity". Dr. Eitel further noted that AMH is dyslexic and has a previous diagnosis of ADHD. See Exhibit 2 at page 2. In her report, she describes AMH's symptoms as follows:

> Her mother reported she is having behavioral issues and was called yesterday due to her throwing items at school. She will have tantrums in which she will run away from her mother or away from the teachers at school. She will speak like an infant and has

2

difficulties with her speech. Her first day at school she had to picked up by her mother due to destroying property and having a tantrum. She will make "snot run down all over her shirt". She will hit, bite, and scratch others when she is having a tantrum. She will hit her head whenever she is upset and rock herself to the point she hits her head. She will have tantrums for hours and to minimize her tantrums her mother must hug her and talk to her. She has sensitivity to loud noises such as her family being loud, her baby sister crying in which [AMH] will hit her baby sister. She has sensitivity to bright lights and has vision problems but wears glasses to correct her vision. She has sensitivity to her clothes and does not like wearing clothes. She prefers to be nude at home with just her undergarments. She will jump up and down whenever she is excited or hand clap. She is avoidant with others and makes poor eye contact with others. She will line up her toys before playing with them. She does not like her mother washing her hair or brushing her hair. She does not like her food to be mixed and prefers to eat noodles every day. She does not have any friends at school and will self isolates. Whenever she is at home, she is often in everyone's personal space. She assumes everyone is her friend and will talk to them. She is obsessed with watching videos of people eating and the show "Stranger Things". She has difficulty picking up social cues and has difficulty adjusting with schedule changes. Her mother must remind her of any changes to avoid any tantrums. She will constantly repeat words or phrases she hears throughout the day. She must watch YouTube every day and if she is unable to watch videos on YouTube, she will hide her siblings' phones or tablets. She is currently not enrolled in speech, occupational, or physical therapy. Her mother reported [AMH] witnessed her younger sisters father deceased in front of a barber shop. Her mother also separated with her biological father when she was 4 years old. She is currently in an ARD and needs a reevaluation. She has played with fire and has burnt holes in the covers. Based on her examination and uncompleted questionaries her mother completed; *Her symptoms, behaviors, and assessments are consistent with Autism Spectrum Disorder, Level 1, with accompanying language impairment.*

Exhibit 2 at pages 1-2.

Dr. Eitel performed a thorough clinical evaluation, which included the use of a number of psychological tests. She also obtained a psychosocial history to assist her in reaching her findings., The doctor concluded that, "She is unable to do things other 8-year-olds can do. She does not socialize with other children and must be supervised whenever she is around her siblings." See

Exhibit 2 at page 2. The findings from the administration of various psychological tests revealed that the child was in the Severe range of aberrated functioning:

> The SRS-2 [Social Responsiveness Scale] is a 65-item parent or self-report that measures the severity of Autism Spectrum symptoms as they occur in natural social settings. The SRS-2 provides a picture of a child's social impairments, assessing social awareness, social information processing, capacity for reciprocal social communication, social anxiety/avoidance, and autistic preoccupations and traits. Each item on the scale inquiries about an observed aspect of reciprocity behavior. Higher scores on the SRS-2 indicate higher degrees of social impairment.
>
> [AMH]'s Total score of>90 falls in the Severe range. Scores in this range indicate deficiencies in reciprocal social behavior that are clinically significant and lead to severe interference with everyday social interactions. Such scores are strongly associated with clinical diagnosis of an autism spectrum disorder.
>
> [AMH]'s score of 87 on the Social Awareness scale falls in the Severe range. Her score of 88 on the Social Cognitive scale falls in the Severe range, also suggesting that she has substantial difficulty on interpreting social cues.
>
> [AMH]'s score of >90 on the Social Communication scale falls in the Severe range. This includes expressive social communication and "motoric" aspects of reciprocal social behavior.
>
> [AMH]'s score of >90 on the Social Motivation scale falls in the Severe range.
>
> [AMH]'s score of >90 in the Restricted Interests and Behaviors scale falls in the Severe range; this includes stereotypical behaviors or highly restricted interests.

Exhibit 2 at page 4. Similarly, the findings from the administration of the DSM-5 Compatible Scales were that AMH fell into the Severe category. Lastly, the Developmental Profile 3 (DP-3) showed marked delays in various physical and behavioral criteria. See Exhibit 2 at pages 5-6.

Recently, AMH was involved in an incident, during which, as she was trying to run away from school, she was involved in a fight with the school authorities who tried to apprehend her. AMH is of large stature for her age, currently weighing 150 lbs. at ten years old. Despite the fact

4

that she is only ten, she has been charged with a juvenile delinquency matter and could be forced into a criminal justice supervision program. That incident is reflective of a continuum of events, during which AMH's reaction to circumstances was a byproduct of the ASD, but nevertheless, still significantly, socially inappropriate. She exhibits a marked inability to monitor and control her own behavior. Lakia is continuously contacted by school authorities to address the outbursts and other inappropriate actions of AMH. This course of conduct is exemplified by the fact that, in the limited time between 11/17/2025 and 02/23/2026, alone, there have been 20 school incident referral reports. They range in severity and include the following: leaving school without permission (elopement); using her weight to crush a teacher against a door; shoving an instructor; cursing; improper, physical altercations with fellow students; throwing items in the classroom; yelling at educators; destroying objects in the classroom; upending furniture; self-flagellation; threatening other students; refusing to perform academic tasks; making disruptive sounds in the classroom; and name-calling. These actions have resulted in numerous suspensions, expulsions, and parental consultations.

### b) YT'S AUTISM

Lakia's daughter, YT, who is now four-and-a-half years old, was also evaluated by Dr. Eitel. See Exhibit 3. Her diagnostic impression is that YT suffers from Autism Spectrum Disorder, Level 2, "Requiring Substantial Support, with accompanying Language Impairment, Associated with a Behavioral Problem". There are significant consequences to such a designation. They include marked deficits in verbal and nonverbal social communication skills; social impairments apparent even with supports in place; limited initiation of social interactions; reduced or abnormal responses to social overtures from others; inflexibility of behavior; difficulty coping with change; restricted/repetitive behaviors appear frequently enough to be obvious to the casual observer and

interfere with functioning in a variety of contexts; and distress and/or difficulty changing focus or action. One who suffers from Level 2 Autism requires substantial support. Dr. Eitel describes YT's past and present illness as follows:

**Physical**
[YT] mother experienced a complicated pregnancy. She was diagnosed with gestational diabetes requiring emergency interventions. [YT] was born prematurely due to fetal distress, potentially linked to maternal medication use including antidepressants. Her delivery was via cesarean section (C-section) one month before the due date. The mother is unclear if [YT] met all developmental milestones on time. [YT] appears to be sensitive to noise and often covers her ears. She is currently not talking, except for possibly one word ("Mommy"), which is not confirmed. She is not potty-trained and has been using pull-ups for about a year. She receives speech therapy assessment scheduled for the 28th of this month (March 2024). A potential occupational therapy assessment to be determined post-evaluation. There is no reported seizures or head injuries.

**Psychiatric**
Her mother reported symptoms of Autism Spectrum Disorder (ASD). Those symptoms include deficits in emotional and social reciprocity, reduced sharing of interest, emotions or affect, abnormal eye contact and body language, deficits in developing and maintaining relationships.

[YT] is currently limited to single-word utterances and cannot form full sentences. She exhibits attention-seeking behaviors such as making grunt noises to interrupt ongoing conversations. Uncertain if she engages in imitative play such as responding to "peekaboo." She appears to have challenges with eye contact, not always looking directly at others. Her play behavior includes both appropriate play and banging toys, which could indicate sensory processing issues. [YT] has been banging her head during tantrums for approximately five months. This behavior occurs when she is agitated or not getting her way. Her motor and sensory behavior she sometimes walks on her tiptoes. Engages in lining up objects, such as blocks. Exhibits a preference for watching the same TV show repeatedly. Displays stimming behaviors, such as fixating on straight objects like straws or pens. Does not seem to understand others' emotions and does not respond to emotional cues. Responds to her name only after being called multiple times, indicating possible challenges with attention or auditory processing. Displays

hyper-focus on activities, making it difficult to redirect her attention. Her communication and social interaction [YT] hit out of frustration when unable to communicate her needs. She has difficulty following instructions, which may suggest a comprehension issue. She does not use pointing to communicate but will lead others by the hand to what she wants. She can shake her head for "no" or "yes," but it is unclear if she understands the meaning. Her facial expressions can convey how she is feeling, but she may not understand personal space and dislikes being touched by strangers. She does not share easily and may not engage in social play, often isolating herself from other children. Her eating habits and sensory responses [YT] is not selective with food and does not exhibit smelling behaviors before eating. She may have a high tolerance for pain, not crying after significant falls or bumps. She repetitive behaviors and sensory issues engages in self-injurious behaviors such as pinching herself. Fascination with observing her own hands, which could be a form of self-stimulatory behavior. Her assessment and recommendations [YT]'s behaviors, including head-banging, tip-toe walking, stimming, and challenges with communication and social interaction, are consistent with behaviors often observed in children with Autism Spectrum Disorder (ASD). The upcoming speech therapy assessment is crucial for addressing her communication delays. An occupational therapy evaluation is recommended to assess sensory processing and provide strategies for managing self-injurious behaviors. A comprehensive psychological assessment to explore the possibility of ASD is warranted to guide diagnosis and intervention planning.

Continuous monitoring and adjustment of interventions will be essential as [YT] begins to receive therapy and as more information about her developmental profile is gathered. She exhibits flapping behaviors and frequently touches her face. She displays a strong aversion to certain types of clothing and shoes, suggesting sensory sensitivities. She has difficulty holding a pencil, indicating potential fine motor skill challenges. It's appearing to have balance issues and may be described as clumsy; has sustained injuries such as running into a table resulting in a black eye. In public spaces, [YT] may express excitement with words like "wow" but also has a tendency to run away. [YT] has difficulty with sleep, potentially staying awake until the early hours of the morning. *Based on the symptoms and behaviors reported by Ms. Jackson, [YT] exhibits a number of characteristics that are consistent with a diagnosis of Autism Spectrum Disorder. The symptoms meet criteria/or Autism Spectrum Disorder.*

Her mother reported symptoms of Pica. Those symptoms include persistent eating of nonnutritive, nonfood substances over a period of at least 1 month. She has a habit of putting non-food items, like crayons, in her mouth, suggesting oral sensory seeking behavior. This also poses a risk of ingestion or choking. The eating of nonnutritive, nonfood substances is inappropriate to the developmental level of the individual. The eating behavior is not part of a culturally supported or socially normative practice. If the eating behavior occurs in the context of another mental disorder (e.g., intellectual disability [intellectual developmental disorder], autism spectrum disorder, schizophrenia) or medical condition (including pregnancy), it is sufficiently severe to warrant additional clinical attention. Her mother shared that he puts everything in her mouth and chews on it. She has been chewing on different things like balls and other objects since he was one year old. For instance, she is putting two colors in her mouth, in a waiting room, and in evaluator office. *Based on the symptoms and behaviors reported by Ms. Jackson, [YT] exhibits a number of characteristics that are consistent with a diagnosis of PICA Disorder.*

Exhibit 3 at pages 1-2.

The manifestations of YT's autism is evidenced consistently by observed behavior, including the following: being almost, completely non-verbal; difficulty with non-verbal communication; eating items which have no food value, such as crayons[1]; having balance and falling problems; remaining awake into the early hours of the morning; self-isolation from siblings and peers; failing to understand social play or cues; self-harm behaviors, including head-banging, tantrums, pinching, and skin-picking; hyper-sensitivity to noise and certain clothing textures; running away from public spaces, which requires close supervision or physical restraints.

Anecdotally, YT has consistently exhibited the behaviors described in Dr. Eitel's report. The child has been admitted for emergency room treatment on multiple occasions for self-inflicted

---

[1] Dr. Eitel gave YT a further diagnosis of PICA: "This disorder is characterized by the persistent eating of non-nutritive substances for at least one month, which is inappropriate to the developmental level of the individual. In [YT]'s case, this includes behaviors such as chewing on non-food items (e.g., crayons, slime, playdough). Ms. Jackson reports that [YT] sometimes puts crayons in her mouth and will eat slime or playdough. During the evaluation, [YT]'s tendency to chew on non-food items was noted, indicating a pattern consistent with PICA." See Exhibit 3 at page 17.

injuries. Most recently, she repeatedly struck her face against a solid kitchen counter. As a result, all of her front teeth were pushed inward. A decision still has to be made whether surgical intervention is necessary. YT has uncontrollable, physical and violent outbursts, whereupon she can cause injury to herself and/or to others attempting to assist her. YT cannot be left alone with other adults in Lakia's absence, with rare exceptions. Her inability to communicate through either verbalization or non-verbal cues presents an enormous problem if anyone, other than Lakia, is tasked with care for the child.

Dr. Eitel administered numerous psychometric tests, all of which led to the conclusion that YT was in the High-Risk range for ASD. The doctor found that on the Autism Diagnostic Observation Schedule (ADOS) Module T, YT exhibited significant delays across all areas of development. For the administration of the Childhood Autism Rating Scale, the standard results indicate that a raw score of between 30 and 36.5 reflects mild to moderate symptoms of autism. YT scored 49.5, which reflects Severe symptomology of the ADOS range. See Exhibit 3 at page 8. Dr. Eitel notes additional examples of YT's behavior, which is of concern:

**Relating to People**
She does not pay close attention to her surroundings and does not seem to care about who is around, indicating a lack of situational awareness and social engagement.

**Emotional Response**
[YT]'s reported difficulties in understanding and responding to emotions are indicative of challenges in emotional regulation and social-emotional development. This can impact their ability to form and maintain social relationships.

**Body Use**
[YT] rubs her face a lot and slaps herself sometimes.

**Adaptation to Change:**
During the evaluation, specific observations related to [YT]'s reactions to changes in activities or routines would be noted, such as resistance, distress, or tantrums when transitions are introduced.

9

[YT]'s repo1ied difficulties with transitions and severe tantrums during changes in activities are indicative of significant challenges in adapting to change. These challenges can impact her ability to participate in daily activities and routines and can be a source of stress for both [YT] and her caregivers.

**<u>Taste, Smell, and Touch Response and Use</u>**
[YT]'s behaviors of chewing on items, preferring certain textures and flavors in foods, and putting non-food items in her mouth indicate sensory processing differences related to taste, smell, and touch. These behaviors are common in children with autism spectrum disorder (ASD) and can impact her safety and dietary habits.

**<u>Verbal Communication</u>**
[YT]'s limited verbal communication, reliance on sounds and pointing, and use of stereotyped phrases indicate significant challenges in expressive language. These behaviors are common in children with autism spectrum disorder (ASD) and can impact her ability to effectively communicate her needs and engage in social interactions.

**<u>Nonverbal Communication</u>**
However, her inconsistent eye gaze, unusual eye contact, and difficulty understanding nonverbal communication from others suggest significant challenges in this area. These behaviors can impact her ability to engage in effective social interactions and interpret social cues.

Exhibit 3 at pages 9-11.

Dr. Eitel's administration of the Behavior Assessment System for Children, Third Edition

(BASC-3) led her to conclude that:

> The BASC-3 Parent Rating Scales results indicate that [YT] exhibits a high level of maladjustment in several areas, particularly in hyperactivity, aggression, depression, atypicality, withdrawal, attention problems, adaptability, social skills, and functional communication. ***These challenges are consistent with the previously identified moderately-to-severely moderate degree of autism spectrum disorder (ASD) and significantly impact her daily functioning.***

10

Exhibit 3 at page 14. The administration of the Social Responsiveness Scale (SRS-2, parent) resulted in the following conclusion:

> [YT]'s T-score of greater than >90 places her in the "Severe" range on the SRS-2. Scores within this range indicate clinically significant deficiencies in reciprocal social behavior, leading to substantial interference with everyday social interactions. ***These impairments are consistent with severe autism spectrum disorder (ASD) symptoms.***

Exhibit 3 at page 16.

The profound nature of YT's autism, gave rise to a lengthy list of recommendations for her treatment. See Exhibit 3 at pages 17-24. YT's treating psychiatrist, Bindu Wagle, has echoed Dr. Eitel's opinions in a recent report, dated 03/03/2026. See Exhibit 5. Dr. Wagle has stated the following:

> Because of her cognitive impairments and developmental delay, she requires a level of supervision that exceeds what is typical for a child her age. Continuous adult monitoring is medically necessary to ensure her safety both inside and outside the home.
>
> Additionally, [YT] has a strong reliance on routine and consistency in her daily environment. Her care needs place considerable demands on her caregivers, including close supervision throughout the day, overnight safety monitoring, and implementation of environmental safety precautions.
>
> Given the severity of her functional limitations, safety risks, and need for continuous supervision, additional support services are medically necessary.

Exhibit 5 at pages 1-2.

It is clear that implementation of these behavioral measures is best initiated by YT's mother, with whom she has a unique relationship. The suggested strategies require ongoing and direct interaction amongst parent, child, therapist, and nutritionist. It can be readily discerned from this extensive list of therapeutic techniques that consistency of care is essential. YT's autism is made even more difficult to address in light of her PICA. Dr. Eitel notes the following:

11

> Managing PICA in [YT] requires a comprehensive and multidisciplinary approach, including ABA therapy, occupational therapy, medical evaluation, environmental modifications, parental training, nutritional support, and regular monitoring. Early and targeted interventions are crucial to reduce and eliminate PICA behaviors and promote safe and appropriate oral behaviors. Regular involvement of parents and collaboration with healthcare providers, therapists, and educators will be essential components of her intervention plan.

Exhibit 3 at page 22.

## II.  <u>CHILDREN OF INCARCERATED PARENTS</u>

There is a significant body of research which addresses the negative consequences for children whose parents are incarcerated. Enclosed is an article published in the National Journal, entitled "Why Children With Parents in Prison are Especially Burdened". See Exhibit 6. P. May Cooper and David Murphey, researchers at Child Trends, conducted a comprehensive study on youth and children of imprisoned adults. The authors estimate that black children, poor children, and children of parents with "little education" are disproportionately represented amongst children with incarcerated parents. The report discusses "adverse childhood experiences (ACEs)," also known as immediate negative outcomes, affecting children with incarcerated parents. The list of such ACEs includes "increased risk for trauma, or toxic stress, particularly when they are cumulative". See Exhibit 6 at page 3.

> In addition, the Child Trends researchers cite related indicators that have potential long-term negative impacts for children. These indicators are frequently present in households where a parent is or has been incarcerated, and they render children vulnerable to fallout from a dynamic that psychologists call "loss of an attachment figure."

Exhibit 6 at page 3.

Attached hereto is a memo written by Jennifer Sailer of the Wisconsin Department of Children and Families, which was provided to counsel concerning this matter. See Exhibit 7. Ms. Sailer echoes the concerns expressed in the aforementioned article:

> I also included some information on WI Families First initiative which has some additional links and resources about the trauma caused to children by being placed in foster care (essentially placed with strangers)...The overall domino effect for the kids with an out of home placement and their trajectory for their futures would likely be negatively impacts if they were separated from each other and also separated from their parent, family, connections, and community. There is no guarantee they would all be placed together, there is also no guarantee they would stay with the same family for 6 yrs, as kids with higher needs may move placements more than once during placement, furthering the negative impact on them.
>
> There is also the risk of termination of parental rights, the children not being placed together, and if rights are terminated, there is always a chance they will not stay connected after an adoption since WI does not have open adoption. Even if mom goes to jail for a couple of months, she could lose housing, other benefits, making it harder to get her children placed back with her, even if they are in foster care for a couple months.

Exhibit 7 at page 1.

There is significant potential that several, if not all, of Lakia's children will be placed either in foster care or long-term, residential treatment for any period of her incarceration. The current placement of Lakia's children is as follows. YT and Lakia's youngest child, "M", live with her full-time. Tragically, YT's father was shot and killed during Lakia's pregnancy with her, and M's father, Michael Ferguson, is currently behind bars. Lakia's other children, AMH, "AH", "AH2", and "AH3" reside with her in Houston 11 months out of the year. During the summer, Lakia sends the older children to Dallas to be with their father, Antoine Heard, Sr. Mr. Heard works full-time, with significant overtime hours, as a forklift operator in a factory. To assist him with caregiving

duties, the children's 80-year-old paternal grandfather occasionally flies in from California to Texas to watch over them.

While Mr. Heard is a hard-working and caring father, his parenting has not been without problems. On several occasions, Child Protective Services has been notified after Mr. Heard has dropped off the children at school, and the smell of marijuana has been detected on their clothing. In short, Mr. Heard's circumstances do not allow him to absorb all of Lakia's children into his home as a permanent caregiver.

Lakia is the only person who can properly who can properly control AMH and YT. Neither her parents, nor her siblings, are capable of assuming responsibilities of Lakia's children. Her mother has a persistent gambling addiction which occupies the majority of her day and frequently takes her away from home. Lakia has no meaningful relationship with her father. One of her sisters has seven children of her own, which precludes her from becoming a surrogate parent to Lakia's own children. Her other sisters are unwilling or unable, for various reasons, to assume a parental role. Lakia has made every effort possible to find an alternative residence and family setting for her large family. She has reached out to friends and family with no success. It appears that one or more of the children are destined for out-of-home and/or institutional placement for the duration of Lakia's incarceration.

### III.  <u>ECONOMIC IMPACT OF INCARCERATION</u>

In addition to the physical and emotional manifestations of autism, there are economic and community consequences that must be taken into account when considering an institutional sentence for Lakia Jackson. Counsel has attempted to provide the Court with the logistical and financial impact resulting from out-of-home state care. It is reasonable to project that Lakia's children who do not suffer from ASD will be placed into foster care. Enclosed are the cost-of-care

14

figures for both Wisconsin and Texas, where the children currently reside. There is significant variability for foster care rates in Wisconsin depending on geographical location.

The attached document, which has been provided by the Wisconsin Department of Health Services, "Family Care: Developmental Disability Center Rates for Managed Care Organizations", outlines the 2023 rates for an intensive treatment program. See Exhibit 8. It is likely that the figures are underestimations of the 2026 service charges. The daily rates depend upon the nature of care that is provided to each child. However, those figures clearly show that the incurred costs to the state will be thousands of dollars per month, per child. The associated costs for both foster care and residential treatment programs are astronomically high. The attached memo from Jennifer Sailer outlines the current rates in Wisconsin. See Exhibit 7. She indicates that for a child with high needs, at the maximum foster care rate of $2,000 per month, the cost over a six-year period is $57,600 for just one child. That is merely for the placement amount, and not the financial obligation for medical assistance and other necessary services. The average residential placement cost exceeds $14,000 per month, or in excess of $168,000 per year.

By comparison, in Texas, the cost of either foster or residential care is outlined in Exhibit 9. Counsel has attempted to calculate these figures based on the Texas Department of Family and Protective Services directive. For Texas, the annual cost of state intervention for all six children is $458,301. 30. The cost for YT, alone, is 168,340.95 per year. The government in this case is seeking a sentence of 60 months/five years. If Lakia's six children receive either foster care or residential treatment, the approximate total which will be borne by the citizens of Texas is $2,291,506.50 conservatively. See Exhibit 10.

## IV. LAKIA'S CHILDHOOD

Lakia has been raising her six children, virtually as a single parent, since their respective births. She shows remarkable care and skill in dealing with the challenges for such a large, complex family. Her accomplishments as a parent is even more significant when considering the manner in which Lakia was raised and her the dysfunction in which she lived for decades. It is a misstatement to say that Lakia was raised in a single-parent household. In actuality, her father was totally absent in the home where she grew up, and her mother was absent from the family home during Lakia's formative years. Her mother would leave Lakia and her siblings, alone at home, while she gambled at casinos throughout the Midwest. When Lakia was a young child, her older sister, by default, assumed the role of both parents. Her sister attempted to cook for, clothe, and generally look after Lakia and her six other siblings until Lakia was 14. There were no adult role models in the family household. The children did not have enough to eat. There was often insufficient money to pay the electrical bill. Clothing was sparse, and adult supervision was non-existent. At some point, Lakia's mother remarried, and her stepfather moved into the family home. He did nothing for the children, other than occupying a room which should have been used for Lakia's siblings. The only continuity that he provided for Lakia's existence was his constant level of intoxication. However, there were more negative consequences to the stepfather's entry into the home. Several of his friends, who had been invited over for drinking sessions, sexually assaulted Lakia. She was 11 and 13 at the time. Notably, no law enforcement action was taken for either assault. To this day, she has not received mental health treatment to any of her trauma.

## V.  <u>LAKIA'S EDUCATION</u>

When Lakia was 15, she left the family home to stay with her best friend and her mother. She spent the next four years at various family and friends' homes. To her credit, Lakia was able to graduate on time, from Kilmer South High School. While she experienced a transient existence,

she was able to support herself by braiding hair. At one point, she obtained employment selling magazine subscriptions, door-to-door, out-of-state. Eventually, when she was 18, Lakia returned to Milwaukee and began to take courses to obtain her CNA certificate. Once she secured that certification, she began classes to get a BA and RN degree. Shortly after returning to Milwaukee, she met Antoine Heard, Sr. She applied for United States Army enlistment. After passing all tests and virtually all other prerequisites, she found out during the physical that she was pregnant with her first child.

## VI.  LAKIA'S WORK HISTORY

In 2018, Lakia opened her first home daycare. That venture lasted only 6 months due to a licensing issue, resulting from an error on her sister's part. Lakia attended Herzing University and Bryant & Stratton to obtain her RN. She worked to earn her degree for approximately two-and-a-half years, before opening two community-based residential facilities (CBRF). Eventually, those two were closed after Lakia relocated to Texas. In 2020, Lakia opened We Care Services (WCS), to provide prenatal care coordination (PNCC). It remained open until December of 2021.

## VII.  LAKIA'S DRUG AND ALCOHOL ABUSE

In approximately 2018, Lakia began to use Percocet. Although she started with 10mg tablets, she gradually increased her usage to 30mg on multiple occasions. When the father of her youngest child, Yosef Timms, was murdered on 07/01/2022, she began drinking excessively. Quickly, she became a daily drinker, consuming one-and-three-quarter liter bottles of tequila and cognac, every other day. She has never had any formal treatment to address this obvious problem. It is a need which could be addressed through 500-hour drug treatment program, offered through the BOP.

## VIII.  LAKIA'S ACCEPTANCE OF RESPONSIBILITY

When Lakia was first notified of the investigation, she immediately cooperated with authorities. An enormous number of personal records were provided to the investigators, without the requirement of a subpoena. There is no claim that she impeded or obstructed investigators in any way during the process. She has been compliant with the terms and conditions of supervised release during the criminal process. Lakia has never denied her involvement in the charged conduct and wholly recognizes the widespread damage that she has done. When she first opened WCS, it was not done with the intent to commit fraud. However, she soon became involved in irregularities, which resulted in fraudulent submissions to the federal government. She does not blame anyone but herself for the decisions she has made, and the illegal activity in which she engaged. Lakia recognizes the immediate and potentially devastating impact to her six children, her own liberty, and the destructive effect it has on governmental programming. The money that was obtained from the federal government while she operated the business went to paying her various employees and the operation of the business, itself. Unquestionably, she derived direct, personal benefit from the funds she illegally secured.

## IX.  DEFENSE RECOMMENDATIONS

As was noted at the beginning of the instant memorandum, "The impact of a criminal sentence can sometimes be more consequential to others than to the defendant, herself." The information provided, herein, demonstrates that there is compelling reason that the punitive component should take into account the family needs of Ms. Jackson. While the Court is constrained to impose a two-year period of imprisonment, the impact of the child-parent separation can be limited through the sentence which the Court imposes for the other count. As such, it is respectfully recommended that the Court impose the period of six months for the Medicaid fraud count, followed by a consecutive two-year period for the Aggravated Identity Theft charge. It is

18

also recommended that the Court authorize, subject to BOP's approval, admission into the 500-hour drug treatment program. The sentence sought by the defense is "sufficient, but not greater than necessary".

Dated at Milwaukee, Wisconsin this 11th day of March, 2026.

Respectfully submitted,

/s/ *Robert G. LeBell*
Robert G. LeBell, SBN 01015710
Attorney for Defendant
788 N Jefferson St, STE 740
Milwaukee, Wisconsin 53202
(414) 331-8177
dorbell@ldm-law.com

# EXHIBIT 1

"What Are the Symptoms of Autism?"

Eunice Kennedy Shriver National Institute of Child Health and Human Development

# What are the symptoms of autism?

En Español

The symptoms of one person with autism can be very different from the symptoms of another person with autism. Health care providers think of autism as a **spectrum disorder**—which means that there is a range of similar features in different people with the disorder.[1]

One person with autism may have mild symptoms, while another may have more serious symptoms, but they both have autism spectrum disorder (ASD).

Despite the range of possible symptoms, there are certain actions and behaviors that are common in ASD and could signal that a child is on the autism spectrum. Parents and caregivers who notice these "**red flags**" should speak to their child's health care provider about autism and screening the child for ASD.

In general, the main signs and symptoms of ASD relate to:

- Communication and interactions with other people
- Routines or repetitive behaviors, sometimes called stereotyped (pronounced *STER-ee-uh-tahypt*) behaviors

Health care providers organize some noticeable symptoms of autism into "red flags" to help parents and caregivers know what to look for as children grow and develop. These red flags are listed below.

## Red Flags for ASD[2,3]

### Communication

- Does not respond to his/her name by 12 months of age
- Cannot explain what he/she wants
- Doesn't follow directions
- Seems to hear sometimes, but not other times
- Doesn't point or wave "bye-bye"
- Used to say a few words or babble, but now does not

## Social Behavior

- Doesn't smile when smiled at
- Has poor eye contact
- Seems to prefer to play alone
- Gets things for him/herself only
- Is very independent for his/her age
- Seems to be in his/her "own world"
- Seems to tune people out
- Is not interested in other children
- Doesn't point out interesting objects by 14 months of age
- Doesn't like to play "peek-a-boo"
- Doesn't try to attract his/her parent's attention

## Stereotyped Behavior

- Gets "stuck" doing the same things over and over and can't move on to other things
- Shows unusual attachments to toys, objects, or routines (for example, always holding a string or having to put on socks before pants)
- Spends a lot of time lining things up or putting things in a certain order
- Repeats words or phrases (sometimes called echolalia [pronounced *ek-oh-LEY-lee-uh*])

## Other Behavior

You can find age-specific milestones on the Centers for Disease Control and Prevention website Learn the Signs. Act Early. If your child does not meet developmental milestones, talk to his or her health care provider about screening for ASD.

**Note about these red flags:**

- Some of these red flags apply only at certain ages, so consider what is typical for other children your child's age.
- Some red flags are more strongly associated with autism than others.
- If your child shows any red flags for autism, talk to his or her health care provider.

## Citations

1. *Diagnostic and Statistical Manual of Mental Disorders,* 5th Edition. (2013). American Psychiatric Association: Washington, DC.
2. Johnson CP, & Myers SM; American Academy of Pediatrics Council on Children with Disabilities. (2007). Identification and evaluation of children with autism spectrum disorders. *Pediatrics, 120*(5), 1183-1215.
3. CDC. Autism Spectrum Disorders—Signs & Symptoms. (2015). Retrieved January 10, 2017, from http://www.cdc.gov/ncbddd/autism/signs.html.

## Related A-Z Topics

Fragile X Syndrome

Intellectual and Developmental Disabilities (IDDs)

Prader-Willi Syndrome (PWS)

## NICHD News and Features

Item of Interest: NIH selects first round of winners of the Community Champions for Disability Health Challenge

Science Update: Potential screening method for autism spectrum disorder analyzes movements, NICHD study suggests

Spotlight: Selected NICHD Research Advances of 2024

All related news

**Content Owner**  Office of Communications

**Last Reviewed Date**  12/23/2025

**EXHIBIT 2**

Dr. Betty Eitel – Psychological Evaluation of AMH

*Filed under separate cover.

**EXHIBIT 3**

Dr. Betty Eitel – Psychological Evaluation of YT

*Filed under separate cover.

**EXHIBIT 4**

"ASD Levels of Severity"

Autism Speaks



   

# ASD levels of severity

In 2013, the American Psychiatric Association (APA) released the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), the handbook used to diagnose of mental disorders, including autism.

The DSM-5 introduced three ASD levels of severity: level 1 ("requiring support"), level 2 ("requiring substantial support"), and level 3 ("requiring very substantial support"). The full-text of the DSM-5 severity levels for autism spectrum disorder (ASD) is provided below with permission from the APA.

## Severity levels for autism spectrum disorder

## Level 3 autism: "Requiring very substantial support"

**Level 3 Autism   REQUIRING VERY SUBSTANTIAL SUPPORT**



- Severe deficits in verbal and nonverbal social communication skills



- Very limited initiation of social interactions
- Minimal response to social overtures from others



- Inflexibility of behavior
- Extreme difficulty coping with change
- Restricted/repetitive behaviors markedly interfere with functioning
- Great distress/difficulty changing focus or action

### Social communication

Severe deficits in verbal and nonverbal social communication skills cause severe impairments in functioning, very limited initiation of social interactions, and minimal response to social overtures from others. For example, a person with few words of intelligible speech who rarely initiates interaction and, when he or she does, makes unusual approaches to meet needs only and responds to only very direct social approaches

### Restricted, repetitive behaviors

Inflexibility of behavior, extreme difficulty coping with change, or other restricted/repetitive behaviors markedly interfere with functioning in all spheres. Great distress/difficulty changing focus or action.



Case 2:24-cr-00198-PP    Filed 03/11/26    Page 27 of 57    Document 63

# Level 2 autism: "Requiring substantial support"



## Social communication

Marked deficits in verbal and nonverbal social communication skills; social impairments apparent even with supports in place; limited initiation of social interactions; and reduced or abnormal responses to social overtures from others. For example, a person who speaks simple sentences, whose interaction is limited to narrow special interests, and how has markedly odd nonverbal communication.

## Restricted, repetitive behaviors

Inflexibility of behavior, difficulty coping with change, or other restricted/repetitive behaviors appear frequently enough to be obvious to the casual observer and interfere with functioning in a variety of contexts. Distress and/or difficulty changing focus or action.

# Level 1 autism: "Requiring support"



## Social communication

Without supports in place, deficits in social communication cause noticeable impairments. Difficulty initiating social interactions, and clear examples of atypical or unsuccessful response to social overtures of others. May appear to have decreased interest in social interactions. For example, a person who is able to speak in full sentences and engages in communication but whose to-and-fro conversation with others fails, and whose attempts to make friends are odd and typically unsuccessful.

# Restricted, repetitive behaviors

Inflexibility of behavior causes significant interference with functioning in one or more contexts. Difficulty switching between activities. Problems of organization and planning hamper independence.

# Related resources

- Answers to frequently asked questions about DSM-5 criteria for autism
- Take a two-minute screening of your child's behavior
- Find local providers and autism services in your area

# Contact the Autism Response Team

Autism Speaks' Autism Response Team can help you with information, resources and opportunities.

**Haga clic aquí para ver esta página en español**.



What is autism?

Autism screening

What causes autism?

Do vaccines cause autism?

Signs and symptoms ▶

Autism diagnosis

Autism diagnosis criteria

Autism severity levels

Asperger syndrome

Child diagnosis

Adult diagnosis



Need personalized support?

Our Autism Response Team (ART) is specially trained to connect people with autism, their families, and caretakers to information, tools, and resources.

Get in touch with ART

**Donate ▶**

News, Updates & More

**Sign up now!**

Follow Us

autism speaks

**EXHIBIT 5**

Dr. Bindu Wagle – Psychiatric Evaluation of YT

*Filed under separate cover.

**EXHIBIT 6**

"Why Children with Parents in Prison Are Especially Burdened"

*The Atlantic*, originally published in the *National Journal*

POLITICS

# Why Children With Parents in Prison Are Especially Burdened

Two reports highlight the psychological effects of mass incarceration that no one is talking about.

By Amy Alexander, Contributor and National Journal



Quincy Jones, 11, attends a holiday party at Hope House in Washington, DC on Saturday. Jones's father is incarcerated.  (Emily Jan)

DECEMBER 14, 2015                    SHARE ↑    SAVE ⊓

Case 2:24-cr-00198-PP    Filed 03/11/26    Page 32 of 57    Document 63

While mass incarceration in America came to dominate the domestic political and policy debate this year, the impact of imprisoned parents on children has largely remained a side issue.

Two new reports make a strong case for centering children and families more squarely in the foreground of discussions on criminal justice—and within evolving legislative and policy changes affecting incarceration.

"Discussions of U.S. corrections policy do not often consider children," write P. Mae Cooper and David Murphey, researchers at Child Trends and authors of a comprehensive study on youth and children of imprisoned adults.

"We need effective programs to mitigate the harm associated with having an incarcerated parent. Although in-prison programs focusing on parenting skills are common, few are focused on meeting the needs of children directly during the time parents are in prison," Cooper and Murphey write.

Some 5 million children, or roughly 7 percent of all children living in the U.S., have a parent who is currently or was previously incarcerated, according to the study, which was published in October 2015 and drew from National Surveys of Children's Health dating to 2007.

———————

Murphey and Cooper estimate that black children, poor children, and children of parents with "little education" are disproportionately represented among the total population of children of incarcerated parents.

———————

Findings in the Child Trends study are echoed in a <u>similar report</u> published Dec. 10 by the Center for American Progress, a progressive political think tank in Washington. CAP researchers Rebecca Vallas, Melissa Boteach, Rachel West, and Jackie Odum found that between 33 million and 36.5 million children—nearly half the total population of U.S. children—have at least one parent who has a criminal record.

Real-world implications for the children of incarcerated parents include a range of potential negative effects, leading authors of the Child Trends study to call for policymakers and lawmakers to step up funding and programs aimed at "reducing the trauma and stigma these children experience, improving communications between the child and the incarcerated parent, and making visits with the incarcerated parent more child-friendly."

And Vallas, director of policy for the Poverty to Prosperity Program at CAP and lead author of the report on parents in the criminal-justice system, said, "Because these challenges affect such a large share of our nation's children, we ignore these intergenerational consequences at our peril."

**What's at Stake**

While researchers at Child Trends acknowledge that there are few longitudinal studies of the long-term impact of parental incarceration on children, Cooper and Murphey's analysis of existing data shows an alarming collection of "adverse childhood experiences (ACEs)," also known as immediate negative outcomes, affecting children with incarcerated parents. The list of such ACEs includes "increased risk for trauma, or toxic stress, particularly when they are cumulative," Cooper and Murphey write.

In addition, the Child Trends researchers cite related indicators that have potential long-term negative impacts for children. These indicators are frequently present in households where a parent is or has been incarcerated, and they render children vulnerable to fallout from a dynamic that psychologists call "loss of an attachment figure." The report found that:

- More than half had lived with someone who had a substance-abuse problem, compared with fewer than 10 percent of children with no parental incarceration.
- Nearly three in five had experienced parental divorce or separation, compared with one in five children without parental incarceration.
- More than one-third had witnessed violence between their parents or guardians, and one-third had witnessed or experienced violence in their neighborhoods. Less than 10 percent of those without an incarcerated parent had experienced either one.
- More than one in four had lived with someone who was mentally ill or suicidal, and nearly one in 10 had experienced the death of a parent.

The major takeaway is that direct interventions are needed to help keep incarcerated parents connected in positive ways with their children, and to have programs that help families, schools, and neighborhoods to cope.

---

> The major takeaway is that direct interventions are needed to help keep incarcerated parents connect in positive ways with their children.

---

Without such programs—including community- and educator-awareness training designed to reduce shame and stigma surrounding incarcerated parents—a toxic cycle of crisis can develop, which could later lead to incarceration for the child.

For families of limited economic means, in particular black and Latino families, options for supporting children with imprisoned parents can be scarce. Murphey and Cooper estimate that black children, poor children, and children of parents with

"little education" are disproportionately represented among the total population of children of incarcerated parents.



Amira Jones, 9, picks out a gift for her aunt and grandmother at Hope House's annual holiday party on Saturday. Jones's mother is in jail. (Emily Jan)

## The Scramble for Solutions

To date, the federal response to this aspect of America's mass-incarceration machinery has been scattershot. With more than 2 million men and women locked up in jails and prisons nationwide—and with blacks and Latinos comprising a majority—the U.S is the most heavily incarcerated country in the developed world. Analyses of impact to communities, municipalities, and states has focused primarily on financial costs, which have increased dramatically since the 1980s.

Yet, with the exception of the Second Chance Act—a bill introduced in 2007 under President George W. Bush that directed the Federal Bureau of Prisons to allow "aging prisoners" under certain circumstances to request transfers to home confinement, and

receive grants to aid reentry—no significant legislation addressing the socioeconomic status of current or former prisoners and their family-members has emerged.

The Second Chance Reauthorization Act, which will renew and update the 2007 bill, was sponsored by Republican Sen. Rob Portman of Ohio last summer and is awaiting a vote. Its focus now must include attention to family needs, in particular children, in the context of inmates and the recently-released, according to the bill's sponsor.

"About 95 percent of the people in our prisons will eventually return to society. It is in all of our interests to give these individuals a second chance," Portman and Democratic Rep. Danny Davis of Illinois argued in a recent op-ed. Davis sponsored the 2007 bill. "That may mean helping someone break a drug habit, acquire needed skills or deal with a mental health issue to hold a job, support a family and pay taxes. The spouses, children and extended family of ex-offenders deserve a second chance and if re-entry programs are successful, our communities will be safer, and taxpayers will save millions of dollars annually," wrote Portman and Davis.

In 2013, the Department of Health and Human Services's Administration for Children and Families convened the Children of Incarcerated Parents' Working Group. The group, led by the White House Domestic Policy Council, is composed of representatives from HHS and the departments of Justice, Housing and Urban Development, Agriculture, and Education, as well as the Social Security Administration. It produced a solutions-oriented tool kit that was distributed to prison bureaus, welfare agencies, and residential reentry centers.

Thus, during the past 20 years, a patchwork of public and private support systems have developed to fill the space left by the dearth of direct federal funding and support for children who have incarcerated parents. The Annie E. Casey Foundation (a *Next America* sponsor), developed a suite of resources for funders and community and charitable organizations designed to "preserve the parent-child connection" during parental incarceration, including literacy programs, mentoring and counseling for children, and parent-child visiting programs.

Some states, too, have mounted programs and services to address the challenge of keeping children and incarcerated parents connected. In Oregon, the state Department of Correction oversees the Children of Incarcerated Parents Project, a 12-year-old public-private initiative that includes Head Start programs, mental-health services, and educational opportunities.

In Washington, Hope House, a nonprofit focusing on helping incarcerated parents stay connected with their children, offers summer-camp opportunities, as well as a recorded-books program. Executive Director Carol Fennelly, who founded Hope House in 1998 and its summer camp a few years later, said that while she's optimistic in general about the recent attention from politicians and policymakers to the larger issue of ending mass incarceration, she has concerns that the status of children and families of the imprisoned is not receiving crucial direct support.

Most urgently needed, in Fennelly's estimation, are educational awareness programs designed to eliminate or lessen the shame and stigma experienced by children of incarcerated parents. "We have had children in our programs who shared with me that one of the hardest parts of what they face is judgment from teachers, peers, and others in their communities," Fennelly said.

"Sometimes people aren't even aware that they react negatively once they first learn that a student has a parent behind bars. But that child certainly can hear it and feel it."

## ABOUT THE AUTHORS

**Amy Alexander, Contributor** ⌄

**National Journal** ⌄

# EXHIBIT 7

Jennifer Sailer – Memo

Wisconsin Department of Children and Families

# Robert LeBell

**To:** Robert LeBell
**Subject:** FW: information on cost of foster care and other resources on other negative impacts and outcomes

 Wisconsin Department of Children and Families

**From:** Sailer, Jennifer - DCF <jennifer.sailer@wisconsin.gov>
**Sent:** Thursday, September 26, 2024 1:19 PM
**To:** Nina Bartoshevich <nina@theparalegalservices.com>
**Subject:** information on cost of foster care and other resources on other negative impacts and outcomes

Hi Nina,
Here is some information on the cost of foster care and residential care. The foster care rates are monthly costs, and the residential rates are daily costs. Like I said, it is hard to say what a foster care rate would be for each child, since there is a range, and it is based on needs and other exceptional costs. The max foster care rate is $2000 per month.

- For a child with high needs at the $2000 cost over 6 yrs is $57,600 for just the one child. This is only placement costs and not other costs such as medical assistance and other services the children may need.
- The average residential placement cost exceeds $14,000 per month (could exceed $168,000 per yr).

I also included some information on WI Families First initiative which has some additional links and resources about the trauma caused to children by being placed in foster care (essentially placed with strangers). There are upcoming town hall meetings for legal and judicial partners on 10/17 from 12-12:50pm. The overall domino effect for the kids with an out of home placement and their trajectory for their futures would likely be negatively impacts if they were separated from each other and also separated from their parent, family, connections, and community. There is no guarantee they would all be placed together, there is also no guarantee they would stay with the same family for 6 yrs, as kids with higher needs may move placements more than once during placement, furthering the negative impact on them.

There is also the risk of termination of parental rights, the children not being placed together, and if rights are terminated, there is always a chance they will not stay connected after an adoption since WI does not have open adoption. Even if mom goes to jail for a couple of months, she could lose housing, other benefits, making it harder to get her children placed back with her, even if they are in foster care for a couple months.

Child welfare would look for family and other people the children know if they were to come into care. If that were to occur, those individuals would be eligible to become licensed as a foster parent and could get the same foster care payment. If foster care can be avoided and they go with family under a plan mom makes, there is voluntary kinship families can get $375 per month (this typically increases each governor's budget).

Foster care rate setting brochure https://link.edgepilot.com/s/25ecf8af/-rZWUoY-QE6qezAQUEGEYg?u=https://dcf.wisconsin.gov/files/publications/pdf/0142.pdf

Memo on the max daily rate for residentials and group homes. (note that this increases every year due to costs of running facilities, etc)
https://link.edgepilot.com/s/65361e7b/xInPtK6DWESjT4UDVGVq7Q?u=https://dcf.wisconsin.gov/files/cwportal/policy/pdf/memos/2024-11i.pdf

1

Case 2:24-cr-00198-PP    Filed 03/11/26    Page 40 of 57    Document 63

This is a good resource with some data on the negative impacts of children being placed outside their parental home into foster care or other settings.  Its short and concise highlighting the negative impacts on children and their outcomes  https://link.edgepilot.com/s/a42972b9/wyjawyuMPUqaGLXMK5SSrA?u=https://dcf.wisconsin.gov/files/familyfirst/playbook-prevention.pdf

There is endless research the negative impacts on children if they are removed from the parent and placed into non-relative foster care.  I just have a few things that might be helpful below:

https://link.edgepilot.com/s/779de3a8/JySc4ZnQO0m8uoMSqum5Ag?u=https://www.americanbar.org/content/dam/aba/publications/litigation_committees/childrights/child-separation-memo/parent-child-separation-trauma-memo.pdf

The unseen costs of foster care
https://link.edgepilot.com/s/f38d9d4d/mLcLn3wLeEmZCFUvVNGXRQ?u=https://www.thetcj.org/wp-content/uploads/2019/10/Alia-unseen-costs-of-FC.pdf

Casey Family Foundations is also a good resource we use, they have a lot of research on trauma and the child welfare system.

Jennifer Sailer MSW, CAPSW
pronouns: she/hers/her
**Program and Policy Analyst Advanced**
**Bureau of Permanence & Out-of-Home Care**
**Division of Safety and Permanence**
Cell phone- (920) 362-6015

 Wisconsin Department of Children and Families

2

# EXHIBIT 8

"Family Care: Developmental Disability Center Rates for Managed Care Organizations"

Wisconsin Department of Health Services


**WISCONSIN DEPARTMENT** *of* **HEALTH SERVICES**

# Family Care: Developmental Disability Center Rates for Managed Care Organizations

This page explains Family Care [https://www.dhs.wisconsin.gov/familycare/index.htm] rates paid by managed care organizations (MCOs) for services members get at the State Centers for Individuals with Intellectual/Developmental Disabilities (DD centers). Wisconsin Department of Health Services (DHS) reviews and revisits these rates each calendar year.

## MCO payment process to DD centers

The payment process for services at DD centers follows these steps:

1. A Family Care member gets a service at a DD center.
2. The DD center bills the MCO. They bill the full daily rate for Intensive Treatment Program and Medical Short-Term Care Unit stays for enrolled Family Care members.
3. Family Care MCOs pay only the Family Care part of the daily rate to the DD Center. They submit payments to this address:
   DHS Institutional Billing
   PO Box 7853
   Madison, WI 53707-7853
4. After the DD Center gets the payment, they submit the claim for the fee-for-service part of the daily rate. This goes to the ForwardHealth interChange claims system.
5. Family Care MCOs submit encounter reporting only for the amount they paid to the DD Center.

Notes:

- **Family Care Partnership** — MCOs pay the full daily rate to the DD center for Family Care Partnership members. No part of the charges goes to Medicaid fee-for-service.
- **Extended stay surcharge** — DHS may apply an extra fee to the total cost of care. This happens if the enrolled member stays at the DD center beyond the planned discharge date. The fees may go up every six months that the member stays at the DD center.
- **Non-typical services surcharge** — A provider can apply an extra fee for non-typical services. These are services that the member doesn't normally need. For instance:
  - Interpretive services
  - One-on-one staffing
  - Unusual living arrangements or medical services

Questions? Contact the Bureau of Rate Setting at DHSDMSBRS@dhs.wisconsin.gov ✉ [mailto:dhsdmsbrs@dhs.wisconsin.gov] .

Case 2:24-cr-00198-PP    Filed 03/11/26    Page 43 of 57    Document 63

# 2024 DD center rates for MCOs

The table shows the portion of rates that Family Care MCOs pay and what Medicaid fee for service pays.

## Medical Short-Term Care Unit rates

| Short-Term Care Unit | Central Wisconsin Center (CWC) | Northern Wisconsin Center (NWC) | Southern Wisconsin Center (SWC) |
|---|---|---|---|
| **MCO Portion/Family Care Rate** | **$1,431** | n/a | n/a |
| 10% Extended Stay Surcharge (first six months) | $1,604 | n/a | n/a |
| 10% Extended Stay Surcharge (additional six months) | $1,777 | n/a | n/a |
| 10% Extended Stay Surcharge (additional six months) | $1,950 | n/a | n/a |
| Non-Typical Services Surcharge | $1,681 | n/a | n/a |
| **Medicaid Portion/Family Care Medicaid Rate** | **$303** | n/a | n/a |
| **FC Partnership MCO Daily Rate** | **$1,734** | n/a | n/a |
| 10% Extended Stay Surcharge (first six months) | $1,907 | n/a | n/a |
| 10% Extended Stay Surcharge (additional six months) | $2,080 | n/a | n/a |
| 10% Extended Stay Surcharge (additional six months) | $2,253 | n/a | n/a |
| Non-Typical Services Surcharge | $1,984 | n/a | n/a |

## Intensive Treatment Program rates

| Intensive Treatment Program | Central Wisconsin Center (CWC) | Northern Wisconsin Center (NWC) | Southern Wisconsin Center (SWC) |
|---|---|---|---|
| **MCO Portion/Family Care Rate** | **$1,552** | **$1,552** | **$1,552** |
| 10% Extended Stay Surcharge (first six months) | $1,748 | $1,748 | $1,748 |
| 10% Extended Stay Surcharge (additional six months) | $1,944 | $1,944 | $1,944 |
| 10% Extended Stay Surcharge (additional six months) | $2,140 | $2,140 | $2,140 |

Case 2:24-cr-00198-PP    Filed 03/11/26    Page 44 of 57    Document 63

| Intensive Treatment Program | Central Wisconsin Center (CWC) | Northern Wisconsin Center (NWC) | Southern Wisconsin Center (SWC) |
|---|---|---|---|
| Non-Typical Services Surcharge | $1,802 | $1,802 | $1,802 |
| **Medicaid Portion/Family Care Medicaid Rate** | **$406** | **$406** | **$406** |
| **Full Intensive Treatment Program/Family Care Partnership Rate** | **$1,958** | **$1,958** | **$1,958** |
| 10% Extended Stay Surcharge (**first six months**) | $2,154 | $2,154 | $2,154 |
| 10% Extended Stay Surcharge (**additional six months**) | $2,350 | $2,350 | $2,350 |
| 10% Extended Stay Surcharge (**additional six months**) | $2,546 | $2,546 | $2,546 |
| Non-Typical Services Surcharge | $2,208 | $2,208 | $2,208 |

# 2023 DD center rates for MCOs

The table shows the portion of rates that Family Care MCOs pay and what Medicaid fee-for service pays.

## Medical Short-Term Care Unit rates

| Short-Term Care Unit | Central Wisconsin Center (CWC) | Northern Wisconsin Center (NWC) | Southern Wisconsin Center (SWC) |
|---|---|---|---|
| **MCO Portion/Family Care Rate** | **$1,267** | n/a | n/a |
| 10% Extended Stay Surcharge (**first six months**) | $1,427 | n/a | n/a |
| 10% Extended Stay Surcharge (**additional six months**) | $1,586 | n/a | n/a |
| 10% Extended Stay Surcharge (**additional six months**) | $1,746 | n/a | n/a |
| Non-Typical Services Surcharge | $1,517 | n/a | n/a |
| **Medicaid Portion/Family Care Medicaid Rate** | **$328** | n/a | n/a |
| **FC Partnership MCO Daily Rate** | **$1,595** | n/a | n/a |
| 10% Extended Stay Surcharge (**first six months**) | $1,755 | n/a | n/a |

| Short-Term Care Unit | Central Wisconsin Center (CWC) | Northern Wisconsin Center (NWC) | Southern Wisconsin Center (SWC) |
|---|---|---|---|
| 10% Extended Stay Surcharge (additional six months) | $1,914 | n/a | n/a |
| 10% Extended Stay Surcharge (additional six months) | $2,074 | n/a | n/a |
| Non-Typical Services Surcharge | $1,845 | n/a | n/a |

### Intensive Treatment Program rates

| Intensive Treatment Program | Central Wisconsin Center (CWC) | Northern Wisconsin Center (NWC) | Southern Wisconsin Center (SWC) |
|---|---|---|---|
| **MCO Portion/Family Care Rate** | **$1,449** | **$1,449** | **$1,449** |
| 10% Extended Stay Surcharge (first six months) | $1,634 | $1,634 | $1,634 |
| 10% Extended Stay Surcharge (additional six months) | $1,820 | $1,820 | $1,820 |
| 10% Extended Stay Surcharge (additional six months) | $2,006 | $2,006 | $2,006 |
| Non-Typical Services Surcharge | $1,699 | $1,699 | $1,699 |
| **Medicaid Portion/Family Care Medicaid Rate** | **$408** | **$408** | **$408** |
| **Full Intensive Treatment Program/Family Care Partnership Rate** | **$1,857** | **$1,857** | **$1,857** |
| 10% Extended Stay Surcharge (first six months) | $2,042 | $2,042 | $2,042 |
| 10% Extended Stay Surcharge (additional six months) | $2,228 | $2,228 | $2,228 |
| 10% Extended Stay Surcharge (additional six months) | $2,414 | $2,414 | $2,414 |
| Non-Typical Services Surcharge | $2,107 | $2,107 | $2,107 |

# 2022 DD center rates for MCOs

The table shows the portion of rates that Family Care MCOs pay and what Medicaid fee-for service pays.

## Medical Short-Term Care Unit rates

| Short-Term Care Unit | Central Wisconsin Center (CWC) | Northern Wisconsin Center (NWC) | Southern Wisconsin Center (SWC) |
|---|---|---|---|
| **MCO Portion/Family Care Rate** | **$970** | **n/a** | **n/a** |
| 10% Extended Stay Surcharge **(first six months)** | $1,090 | n/a | n/a |
| 10% Extended Stay Surcharge **(additional six months)** | $1,211 | n/a | n/a |
| 10% Extended Stay Surcharge **(additional six months)** | $1,331 | n/a | n/a |
| Non-Typical Services Surcharge | $1,220 | n/a | n/a |
| **Medicaid Portion/Family Care Medicaid Rate** | **$234** | **n/a** | **n/a** |
| **FC Partnership MCO Daily Rate** | **$1,204** | **n/a** | **n/a** |
| 10% Extended Stay Surcharge **(first six months)** | $1,324 | n/a | n/a |
| 10% Extended Stay Surcharge **(additional six months)** | $1,445 | n/a | n/a |
| 10% Extended Stay Surcharge **(additional six months)** | $1,565 | n/a | n/a |
| Non-Typical Services Surcharge | $1,454 | n/a | n/a |

## Intensive Treatment Program rates

| Intensive Treatment Program | Central Wisconsin Center (CWC) | Northern Wisconsin Center (NWC) | Southern Wisconsin Center (SWC) |
|---|---|---|---|
| **MCO Portion/Family Care Rate** | **$1,018** | **$1,018** | **$1,018** |
| 10% Extended Stay Surcharge **(first six months)** | $1,159 | $1,159 | $1,159 |
| 10% Extended Stay Surcharge **(additional six months)** | $1,300 | $1,300 | $1,300 |
| 10% Extended Stay Surcharge **(additional six months)** | $1,441 | $1,441 | $1,441 |
| Non-Typical Services Surcharge | $1,268 | $1,268 | $1,268 |
| **Medicaid Portion/Family Care Medicaid Rate** | **$392** | **$392** | **$392** |

Case 2:24-cr-00198-PP     Filed 03/11/26     Page 47 of 57     Document 63

| Intensive Treatment Program | Central Wisconsin Center (CWC) | Northern Wisconsin Center (NWC) | Southern Wisconsin Center (SWC) |
|---|---|---|---|
| **Full Intensive Treatment Program/Family Care Partnership Rate** | **$1,410** | **$1,410** | **$1,410** |
| 10% Extended Stay Surcharge (**first six months**) | $1,551 | $1,551 | $1,551 |
| 10% Extended Stay Surcharge (**additional six months**) | $1,692 | $1,692 | $1,692 |
| 10% Extended Stay Surcharge (**additional six months**) | $1,833 | $1,833 | $1,833 |
| Non-Typical Services Surcharge | $1,660 | $1,660 | $1,660 |

Last revised April 22, 2024

Case 2:24-cr-00198-PP    Filed 03/11/26    Page 48 of 57    Document 63

### What is the Uniform Foster Care Rate?

The Uniform Foster Care Rate (UFCR) is a standard scale of monthly payments to foster parents for the cost of caring for a foster child. Because the rate is based on the needs of each child, it may also include extra payments (called Supplemental and Exceptional Rate payments) in addition to a BASIC MAINTENANCE RATE.

### What does the Basic Maintenance Rate include?

The Basic Maintenance Rate is intended to cover food, clothing, housing, basic transportation, personal care, and other expenses on a monthly basis.

### Certified Level One

The Basic Maintenance Rate provided for a child of any age by a foster home that is certified to provide level one care is:

|  | Jan. 2024 | Jan. 2025 |
|---|---|---|
| Level One | $375 | $375 |

### Certified Above Level One

The current age-related Basic Maintenance Rate for a foster home that is certified to provide care at a level of care that is higher than Level One care. The rate for each child is listed below by age group.

| Age of Child | Jan. 2024 | Jan. 2025 |
|---|---|---|
| 0 – 4 | $441.00 | $441.00 |
| 5 – 11 | $483.00 | $483.00 |
| 12 – 14 | $548.00 | $548.00 |
| 15 – 18 | $572.00 | $572.00 |

When a foster child in your care turns 5, 12, or 15 years of age, you will receive the next highest rate effective the date of on which the birthday occurs.

You will receive payment for your foster child for the day the child enters your home but not for the day the child leaves your home.

On the next page is a breakdown of the percentages typically spent on the basic necessities for children at various ages. This is intended as a guide. It is understood that your family will use the monthly Uniform Foster Care Rates in the manner which best meets your foster child's needs.

### Guidelines for use of the Basic Rate

These specific breakdowns by food, clothing, housing, and personal care, and other expenses are based on the cost of raising a child as calculated by the U.S. Department of Agriculture. Because the cost of raising a child is more than the amount provided through the Basic Maintenance Rate, these percentages provide only a guide for foster parents. The figures presented are percentages of the Basic Maintenance Rate received for a child in the designated age group.

#### FOOD

| | |
|---|---|
| Age 0 to 4: | 17 to 30% |
| Age 5 to 11: | 26 to 33% |
| Age 12 to 14: | Approx. 33% |
| Age 15+ | Approx. 33% |

#### CLOTHING

| | |
|---|---|
| Age 0 to 4: | Approx. 6% |
| Age 5 to 11: | Approx. 8% |
| Age 12 to 14: | Approx. 11% |
| Age 15+ | Approx. 13% |

#### HOUSING

| | |
|---|---|
| Age 0 to 4: | 48 to 58% |
| Age 5 to 11: | Approx. 43% |
| Age 12 to 14: | Approx. 39% |
| Age 15+ | Approx. 36% |

#### PERSONAL CARE AND OTHER EXPENSES*

| | |
|---|---|
| Age 0 to 4: | Approx. 18% |
| Age 5 to 11: | Approx. 19% |
| Age 12 to 14: | Approx. 17% |
| Age 15+ | Approx. 17% |

*Other expenses include but are not limited to haircuts, soap, shampoo, toothpaste, and school supplies.

### Is there an additional payment for children who have special needs?

Yes, for a foster home that is certified to provide care at a level of care that is higher than Level One care. If your foster child has emotional, behavioral, or medical needs, you may request an additional monthly payment to cover the costs of caring for the child's special needs. When approved, this payment is called a SUPPLEMENTAL RATE.

### How is the Supplemental Rate determined?

Within the first 30 days after a foster child is placed in your home, you and your case worker will discuss whether the child may qualify for a Supplemental Rate payment. If your foster child has needs that require special care or supervision, the child welfare professional will submit a description of the child's needs or characteristics.

Evaluations from doctors, psychiatrists, therapists, or other specialists may be included with the child welfare professional's report.

Using a point scale and all the information regarding the child's emotional, behavioral, and medical needs, the placing agency determines the level of care the child requires and identifies special needs of the child.

The level of care and the identified special needs of the child establishes the Supplemental Rate.

### Can Supplemental Rates be changed?

You and the child welfare professional will review your foster child's progress at least every six months. At those reviews, the Supplemental Rate may be changed if the child's condition is changed. Inform your child welfare professional of significant changes when they occur.

### What if a child needs constant care or supervision?

If a child has extraordinary needs, you may receive an additional payment called an EXCEPTIONAL RATE. This payment may be provided if the child's placement in your home allows the child to be moved from a more restrictive setting or prevents the child's placement in such a setting. Only providers certified above a Level One can receive exceptional rates.

### You may receive an Exceptional Rate if, for example:

- the child has intensive physical needs which require increased supervision.
- the child has severe behavioral needs.
- the child is diagnosed as having a severe mental illness such as schizophrenia, severe cognitive disability, brain damage, or autism.
- the child chronically abuses alcohol or other drugs and needs close supervision.
- you are transporting the child to the school they attended prior to removal and this is in a district other than the district you live in.

No monthly payment for the combined Basic Maintenance, Supplemental, and Exceptional Rates may exceed $2,000.

**What if a child comes to my home with few or no clothes?**
You may be provided an INITIAL CLOTHING ALLOWANCE (see table below) if:

- it is the foster child's first placement; or
- it has been at least four months since the child was last in out-of-home care.

| Age Group | Initial Clothing Allowance |
|---|---|
| 0 – 4 | up to $225.00 |
| 5 – 11 | up to $263.00 |
| 12 – 14 | up to $300.00 |
| 15 – 18 | up to $300.00 |

Periodic clothing allowances, such as for seasonal clothing, are not allowed. An amount is included in the Basic Maintenance Rate for this purpose each month.

**What if I don't agree with the rate?**

You may request that the rate be redetermined. You may discuss your concerns with the rate setter and the agency director. If you still disagree with the rate, you should consider appealing through the fair hearing process. Your agency director or Foster Care Coordinator will tell you how to request a fair hearing.

**Is there liability insurance for foster parents?**

A statewide fund provides some protection when your own insurance policies do not. The state fund covers some property damage and personal injury caused by the foster child. The extent of coverage and exclusions is subject to change. The agency that licensed your foster home can give you up-to-date information.

**More questions?**
Contact your Child Welfare Professional or Foster Care Coordinator for further explanations. You can also visit our Foster Care website at https://dcf.wisconsin.gov/cwportal/fc/licensing

If you have general questions about foster care or adoption in Wisconsin, you can also contact the Wisconsin Family Connections Center at https://wifamilyconnectionscenter.org/ or 1-800-762-8063 or email info@wifamilyconnectionscenter.org.

DCF-P-PFS0142 (R. 11/2023)

The Department of Children and Families is an equal opportunity employer and service provider. If you have a disability and need to access services, receive information in an alternate format, or need information translated to another language, please call (608) 266-8787. Individuals who are deaf, hard of hearing, deaf-blind or speech disabled can use the free Wisconsin Relay Service (WRS) – 711 to contact the department.

**MY FOSTER CHILDREN'S RECORDS**

| CHILD'S NAME | PLACEMENT DATE | BASIC MAINTENANCE RATE | SUPPLEMENTAL RATE | EXCEPTIONAL RATE | MONTHLY RATE | LAST REVIEW RATE |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

# UNDERSTANDING THE UNIFORM FOSTER CARE RATE

**Effective January 1, 2024 – December 31, 2025**



**Wisconsin Department of Children and Families**

**Division of Safety and Permanence**

**EXHIBIT 9**

"Texas Child-Centered Care (T3C) System Blueprint – January 2026"

Texas Department of Family and Protective Services



# Texas Child-Centered Care (T3C) System

## BLUEPRINT

### January 2026

Texas Department of
Family and Protective Services

defined service array, universal assessment, and modernized rate structured offered under the T3C System, once fully implemented, there should be a decrease in the use of Exceptional Foster Care and Child-Specific Contracts.

*HHSC will continue to maintain rates using updated cost report data (when available), along with continuing to leverage the other data sources used to calculate the below listed pro forma modeled rates.  For more information on pro forma rates and the T3C rate setting methodology and process, please refer to The Foster Care Rate Modernization:  Pro forma Modeled Rates and Fiscal Impact Report published by HHSC in February 2023.*

Table 1. Child Placing Agency/Foster Family Home T3C Methodological Rates
*Community-based Service Packages*

| Primary Service Package | Methodological Daily Rate Total | Child Placing Agency Retainage Portion | Foster Family Home Pass through Portion |
|---|---|---|---|
| T3C Basic Foster Family Home Support Services | $83.29 | $36.39 | $46.90 |
| Substance Use Support Services | $148.14 | $88.57 | $59.57 |
| Short-Term Assessment Support Services (Not eligible for Add-On Services) | $150.40 | $77.22 | $73.18 |
| Mental & Behavioral Health Support Services | $169.49 | $109.92 | $59.57 |
| Sexual Aggression/Sex Offender Support Services | $186.47 | $95.69 | $90.78 |
| Complex Medical Needs or Medically Fragile Support Services | $187.80 | $94.53 | $93.27 |
| Human Trafficking Victim/Survivor Support Services | $217.26 | $117.05 | $100.21 |
| Intellectual or Developmental Disability (IDD)/ | | | |



| Primary Service Package | Methodological Daily Rate Total | Child Placing Agency Retainage Portion | Foster Family Home Pass through Portion |
|---|---|---|---|
| Autism Spectrum Disorder Support Services | $219.98 | $129.20 | $90.78 |
| T3C Treatment Foster Family Care Support Services | $328.41 | $188.83 | $139.58 |

### Table 2. Child Placing Agency/Foster Family Home T3C Methodological Rates
*Community-based Add-On Services*

| Add-On Service | Methodological Daily Rate Total | Child Placing Agency Retainage Portion | Foster Family Home Pass through Portion |
|---|---|---|---|
| Transition Support Services for Youth & Young Adults Add-On Service | $37.40 | $11.28 | $26.12 |
| Kinship Caregiver Support Services Add-On Service | $38.22 | $38.22 | Not Applicable |
| Pregnant & Parenting Youth or Young Adult Support Services Add-On Service | $51.22 | $24.94 | $26.28 |

### Table 3. General Residential Operations-Tier I T3C Methodological Rates
*Treatment/Transition Service Packages*

| Service Package | Methodological Daily Rate Total |
|---|---|
| Tier I:  T3C Basic Child Care Operation | $270.80 |
| Tier I:  Services to Support Community Transition for Youth & Young Adults who are Pregnant or Parenting | $365.60 |
| Tier I:  Sexual Aggression/Sex Offender Treatment Services to Support Community Transition | $366.17 |
| Tier I:  Substance Use Treatment Services to Support Community Transition | $389.67 |
| Tier I:  Emergency Emotional Support & Assessment Center Services | $390.91 |



| Service Package | Methodological Daily Rate Total |
|---|---|
| Tier I:  Complex Medical Needs Treatment Services to Support Community Transition | $422.30 |
| Tier I:  Mental & Behavioral Health Treatment Services to Support Community Transition | $453.53 |
| Tier I:  Intellectual or Developmental Disability (IDD)/Autism Spectrum Disorder Treatment Services to Support Community Transition | $461.23 |
| Tier I:  Human Trafficking Victim/Survivor Treatment Services to Support Community Transition | $472.14 |

## Table 4. General Residential Operations-Tier II T3C Methodological Rates
*Treatment/Stabilization Service Packages*

| Service Package | Methodological Daily Rate Total |
|---|---|
| Tier II:  Sexual Aggression/Sex Offender Services to Support Stabilization | $540.60 |
| Tier II:  Substance Use Services to Support Stabilization | $565.50 |
| Tier II:  Aggression/Defiant Disorder Services to Support Stabilization | $574.65 |
| Tier II:  Complex Mental Health Services to Support Stabilization | $583.33 |
| Tier II:  Complex Medical Services to Support Stabilization | $623.53 |
| Tier II:  Human Trafficking Victim/Survivor Services to Support Stabilization | $669.03 |

## Table 5. Foster Care Maintenance Payments for Children of Youth and Young Adults in Foster Care

Under the T3C System, DFPS will reimburse the room and board costs for the child(ren) of a youth or young adult parent, when the parent is in the Department's Conservatorship and is in foster care, or is residing in Extended Foster Care.  The daily reimbursement rate to off-set these room and board costs for Foster Homes and GROs can be found in the table below.



# EXHIBIT 10

T3C System Rates Breakdown

# T3C System Blueprint

| | SERVICE PACKAGE | FOSTER FAMILY - METHODOLOGICAL DAILY RATE | FOSTER FAMILY - METHODOLOGICAL YEARLY RATE | SERVICE PACKAGE | RESIDENTIAL OPERATION - METHODOLOGICAL DAILY RATE | RESIDENTIAL OPERATION - METHODOLOGICAL YEARLY RATE |
|---|---|---|---|---|---|---|
| **CHILD 1** (10 YO) Presents with ASD + JV Rec | Intellectual or Developmental Disability (IDD)/ Autism Spectrum Disorder Support Services | $219.98 | $80,292.70 | Tier I: Intellectual or Developmental Disability (IDD)/ Autism Spectrum Disorder Support Services | $461.23 | $168,348.95 |
| **CHILD 2** | T3C Basic Foster Family Home Support Services | $83.29 | $30,400.85 | Tier I: T3C Basic Child Care Operation | $270.80 | $98,842.00 |
| **CHILD 3** | T3C Basic Foster Family Home Support Services | $83.29 | $30,400.85 | Tier I: T3C Basic Child Care Operation | $270.80 | $98,842.00 |
| **CHILD 4** | T3C Basic Foster Family Home Support Services | $83.29 | $30,400.85 | Tier I: T3C Basic Child Care Operation | $270.80 | $98,842.00 |
| **CHILD 5** | T3C Basic Foster Family Home Support Services | $83.29 | $30,400.85 | Tier I: T3C Basic Child Care Operation | $270.80 | $98,842.00 |
| **CHILD 6** (2 YO) Presents with ASD + PICA + Non-Verbal + Self-Harm | Intellectual or Developmental Disability (IDD)/ Autism Spectrum Disorder Support Services | $219.98 | $80,292.70 | Tier I: Intellectual or Developmental Disability (IDD)/ Autism Spectrum Disorder Support Services | $461.23 | $168,348.95 |
| **TOTAL COSTS** | | **$773.12** | **$282,188.80** | | **$2,005.66** | **$732,065.90** |
| | | | | | | |
| $30,400.85 | 4 Children in Foster Care | $121,603.40 | | | | |
| $168,348.95 | 2 Children in Residential System | $336,697.90 | | | | |
| | **CONSERVATIVE EST. IF 4 KIDS ARE PLACED IN FOSTER CARE AND 2 KIDS ARE INSTITUTIONALIZED PER ANNUM** | **$458,301.30** | | | | |